CHICAGO BOARD OF TRADE, Petitioner,

v.

UNITED STATES of America, Federal Communications Commission, Respondents,

Western Union Telegraph Company, Intervenor.

No. 12280.

United States Court of Appeals District of Columbia Circuit.

Argued March 7, 1955.

Decided June 2, 1955.

1. Folkins v. Watson, 1954, 129 F.Supp. 362.

Mr. Kelley E. Griffith, Washington, D. C., with whom Mr. Herbert J. Miller, Jr., Washington, D. C., was on the brief, for petitioner.

Mr. Warren E. Baker, Gen. Counsel, Federal Communications Commission, with whom Mr. Charles H. Weston, Sp. Asst. to the Atty. Gen., and Mr. J. Smith Henley, Asst. Gen. Counsel, Federal Communications Commission, Harrison, Ark., were on the brief, for respondents. Mr. Richard A. Solomon, Asst. Gen. Counsel, Federal Communications Commission, and Mr. Stanley S. Neustadt, Counsel, Federal Communications Commission, New York City, entered appearances for respondent Federal Communications Commission.

Mr. William Wendt, New York City, of the bar of the Court of Appeals of New York, *pro hac vice*, by special leave of Court, with whom Messrs. John H. Waters, New York City, and Dale D. Drain, Washington, D. C., were on the brief, for intervenor.

Before PRETTYMAN, BAZELON and BASTIAN, Circuit Judges.

PRETTYMAN, Circuit Judge.

This is a petition for review of an order of the Federal Communications Commission, which terminated an investigation into the reasonableness of new rates proposed to be charged by the Western Union Telegraph Company for certain leased facilities. The order permitted new tariff schedules, requiring the increased charges, to go into effect.

Western Union offers to the public for lease certain facilities, which consist in this instance of tickers, loops and circuits. The rentals consist of certain amounts for each ticker, certain amounts for each loop, and certain amounts for each circuit. Charges for the tickers vary, depending upon whether the ticker is an operating one or is a spare, and upon whether it is operated by the lessee at normal speed (60 words per minute) or at high speed (100 words per minute). Western Union filed tariff schedules proposing to increase the monthly rates for tickers used at normal speed and to establish new rates for tickers used at high speed. The American Stock Exchange and the Chicago Board of Trade lease normal-speed facilities for the operation of interstate ticker networks, by which they disseminate quotations, etc. The New York Stock Exchange uses both normal-speed and high-speed facilities. When Western Union filed its new schedules the Chicago Board of Trade and the American Stock Exchange requested suspension of the tariffs. The New York Stock Exchange intervened. Hearings were had, and the Commission sustained the proposed rates. The Chicago Board of Trade petitioned this court for review.

The rates approved for tickers operating at normal speed were $20.00 per month and $17.00 per month for spares. The rates approved for tickers operating at high speed were $25.00 per month and $20.00 per month for spares. The same machines are used at both normal and high speed. The rate of operation is determined by the transmitter, that is, by the lessee. The furnishing of these tickers constitutes a very small segment of the operations of Western Union. In its brief Western Union tells us the record shows that for 1952 the revenues under the new schedules would have been approximately three-tenths of one per cent of its total revenues.

Before the Commission, Western Union justified the increased charge for tickers operated at normal speed by the cost of furnishing the tickers and the value of the service to the users. The spare ticker rate was fixed at 85 per cent of the operating ticker rate, in accordance with a long-established relationship fixed by Western Union and the Bell Telephone System. Western Union contended that the new rates for high-speed tickers—25 per cent higher than the rates furnished for normal-speed operation—were based upon value-of-service considerations and are consistent with

long-existent practices of Western Union and the Bell System.

The basic computation in the case was made in respect to the tickers operated at normal speed. The Commission computed, in some detail, a ticker rate base. It included material and installation costs, deducted depreciation reserve, and added an allowance for supplies. It reached a figure of $268.66 per ticker. Then it computed annual costs. It included labor, material, and other disbursements, depreciation, taxes, and a return (profit) for the Company. Allowing a return of 7½ per cent on the rate base, as claimed by Western Union, this computation produced a monthly revenue requirement of $19.84. The allowed rental was $20.00. The Commission concluded, on the basis of its computations, that this rental is reasonable.

In its brief here the Chicago Board of Trade presents thirteen points. We shall discuss ten of them.

■ 1. Petitioner says the Commission failed to make basic findings to support its conclusion that a 7½ per cent rate of return is just and reasonable. The charge is for a single service among many services and involves a very small segment of the carrier's business. The standard set by the Supreme Court for system-wide determinations—"Rates which enable the company to operate successfully, to maintain its financial integrity, to attract capital, and to compensate its investors for the risks assumed"[1]—is inapplicable to the determination of a single rate among many rates. In the first place mathematically precise calculations of rates of return and costs cannot be made in respect to minute segments of a huge business. The allocated proportions of many factors are infinitesimal, too small for precision. In the second place, to achieve a fair rate of return for a whole system, composed of many services, the rates on some services must necessarily be above the norm and on other services below it.

■ The Interstate Commerce Commission early met the problem of a rate for carriage of a single commodity. In 1905[2] the Commission pointed out the difference between such a rate and an entire system of rates. It said the question whether the revenue yielded by all the rates is a fair return has "only a very remote, if any practical, bearing on the reasonableness of a rate on a single article of traffic." On the other hand, it said, the reasonableness of a single rate depends upon "the value, volume and other characteristics affecting the transportation of the particular commodity". That decision of the Commission was affirmed by the Supreme Court.[3] The rule has been referred to in other cases by the Commission[4] and by the Court.[5] The old Commerce Court referred to it.[6] So far as we can ascertain, that rule is well-established law.

■ In the case at bar the Commission did not fix a rate of return and make a calculation based upon it; it merely observed in passing that the claim of

1. Federal Power Comm. v. Hope Natural Gas Co., 1944, 320 U.S. 591, 605, 64 S.Ct. 281, 88 L.Ed. 333, quoted by this court in Washington Gas Light Co. v. Baker, 1950, 88 U.S.App.D.C. 115, 118, 188 F.2d 11, 14, certiorari denied, 1951, 340 U.S. 952, 71 S.Ct. 571, 95 L. Ed. 686.

2. Central Yellow Pine Asso. v. Illinois C. R. Co., 10 I.C.C. 505, 539–540.

3. Illinois Cent. R. Co. v. Interstate Com. Comm., 1907, 206 U.S. 441, 27 S.Ct. 700, 51 L.Ed. 1128.

4. Bridgeman-Russell Co. v. G. L. T. Corporation, 1921, 61 I.C.C. 260, 267; United Paperboard Co. v. G. & J. Ry. Co., 1925, 102 I.C.C. 502, 506. And see III–B Sharfman, The Interstate Commerce Commission 8–13 (1936).

5. Northern Pacific R. Co. v. Department of Public Works, 1925, 268 U.S. 39, 45 S.Ct. 412, 69 L.Ed. 836; Northern Pac. Ry. Co. v. State of North Dakota, 1915, 236 U.S. 585, 599, 603, 35 S.Ct. 429, 59 L.Ed. 735; Interstate Com. Comm. v. Union Pacific R. Co., 1912, 222 U.S. 541, 549, 32 S.Ct. 108, 56 L.Ed. 308.

6. Lehigh Valley R. Co. v. United States, Com.Ct.1913, 204 F. 986.

Western Union for its charge on normal-rate tickers in operation would provide a net return of 7½ per cent on the rate base calculated per ticker. This was a proper procedure. The Commission properly observed what rate of return the contemplated charge would produce, noting that it was within the area of reason, without attempting to make a precise mathematical calculation by the rate-of-return formula.

■ 2. Petitioner says the Commission's computation of the average original cost of tickers is "a mathematical impossibility". Its (*i. e.*, petitioner's) calculation is based upon the average cost per ticker shown in the three contracts under which the tickers were purchased. Western Union had made its calculation directly from its warehouse records. A witness testified that those records were based upon the purchase contracts but that a conversion charge was included in respect to some of the first purchased tickers. Petitioner had copies of the purchase contracts but did not present them at the hearing. It made, both to the examiner and to the Commission, the point it now makes here. We find no basis for disturbing the determination of the Commission upon the point. It was a factual point and was supported by substantial evidence.

■ 3. Petitioner contends that the Commission erred in finding that the tickers in use had depreciated only 45.3 per cent at the time of the hearing. This was pertinent to the determination of the depreciation reserve assignable to each ticker, used in determining the ticker rate base. Western Union merely used the ratio of its overall depreciation reserve to its total operating equipment. The Commission concluded that it is not possible to determine from the Company's records the exact amount of depreciation accrued on each ticker or on all the tickers, separate from all the other items in the operating equipment accounts. Those records are kept in accordance with the system of accounts prescribed by the Commission for these utilities. That system does not provide for separate accrual of depreciation upon each item of operating equipment. No information was presented to the Commission to indicate that the ratio of accrued depreciation to cost with respect to tickers differed materially from that ratio with respect to operating equipment generally.

Petitioner says Western Union failed to meet its burden of proof in respect to this item. It also says the composite depreciation reserve for tickers does not meet the test of the Commission prescription for annual depreciation, as reported to the Commission annually by Western Union. It says the reported annual depreciation on tickers from January 1, 1943, to December 31, 1952, totaled 70.5 per cent. It reached this figure by applying the annual depreciation rate of 8.89 per cent prescribed by the Commission for "equipment furnished customers", which account includes many items of equipment other than tickers. The Commission has prescribed no separate depreciation rate for tickers. Our petitioner presented to the Commission the point it makes here. But the Commission found no reason to believe that the result reached by Western Union's calculation was inconsistent with the composite rate. Western Union now points out to us that our petitioner makes its calculation without allowance for retirements and replacements, an obvious error in such a calculation. We find no error in the conclusion of the Commission upon this point.

■ 4. Petitioner says the Commission erred in the allowance ($61.24) which it made in the rate base to represent the pro rata cost of "maintenance spare tickers". Petitioner confuses these tickers with spare tickers. Spare tickers are located on the customer's premises, readily available for service in case of breakdown. The charge for them is for an additional service. Maintenance tickers are in Western Union's possession, to be transported to and installed upon the customer's premises when an

operating ticker breaks down and the customer has no spare ticker service.

The Commission based its rate base figure for this item upon the ratio of maintenance tickers to tickers on customers' premises, as shown by a study of the situation as of June 30, 1950. Our petitioner maintains that the findings on the point are not sufficient and, furthermore, that the Commission should have used a study as of December 31, 1952. We think the findings are sufficient. They indicate precisely and clearly the basis upon which the Commission made its conclusion and point directly to the evidence in support of it. This is not the sort of point upon which the court could, even if it would, substitute its judgment for that of the Commission.

█ 5. Petitioner says the Commission erred in computing annual depreciation on the original cost of the tickers instead of on net depreciated cost computed annually. But the method followed by the Commission in this respect is well established in public utility law and accounting. It is what is called straight-line depreciation accounting and is prescribed in the Commission's accounting rules. As a matter of fact it is probably the preferable system, being simpler than the other. Moreover the net results of the two calculations, if properly made, would be the same, since the total depreciation must in any event return the original cost of the property at the end of its useful life.

█ 6. Petitioner attacks the Commission's finding that the average ticker location life is 4½ years. This was the result of balancing conflicting testimony. The Commission based its finding upon a study of the 1945–1949 period. Our petitioner presented a witness, who made a calculation based upon a study of the installations and removals of tickers for it (the Chicago Board of Trade) for the period 1950–1953. The witness then tes-

tified to his best engineering estimate. The court is not called upon to exercise a judgment in the evaluation of testimony of this sort upon such points.

█ 7. Petitioner says no allocation of costs and revenues was made between interstate and intrastate commerce and no findings were made to show that such allocation was unnecessary. The Commission found that the record showed there are no differences between the costs of furnishing the tickers when they are used to render intrastate "C.N.D. quotation service"[7] and the costs when the tickers are used in interstate leased facilities service. The tickers used in both cases are the same type of machine. The cost figure calculated by the Commission was a cost per machine, not a total cost figure for all machines in leased service. Therefore the Commission concluded that no allocation of costs, involving, as it necessarily would, separate itemizations for interstate use, was necessary. We think this conclusion is valid and in no way conflicts with the doctrine expressed by us in the Capital Transit case,[8] where we dealt with a system-wide rate-making procedure applicable to wide areas, both intrastate and interstate, and in which total figures were being calculated and used.

█ 8. Petitioner says the Commission erred in failing to hold that the rates for tickers in leased services are unlawfully discriminatory when compared with Western Union's charges for its C.N.D. service. But the two services are obviously different, and the Commission so held.

█ 9. Petitioner says the Commission erred in failing to hold that the high-speed ticker rate is discriminatory and is unlawful when compared with the normal-speed rate. Petitioner says, since an operator at high speed can transmit 66⅔ per cent more information than does a normal-speed operator (500 characters

---

7. A ticker service operated by Western Union itself.

8. Capital Transit Co. v. Public Utilities Commission, 1954, 93 U.S.App.D.C. 194, 213 F.2d 176, certiorari denied 1954, 348 U.S. 816, 75 S.Ct. 25, 99 L.Ed. ——.

as compared with 300 characters), a rate differential of only 25 per cent is discriminatory to normal-speed operators. The Commission pointed out that, although our petitioner, a normal-speed operator, presented this point upon the hearing, it failed to show how normal-speed operators would benefit by an increase in the rates for tickers operated at high speed. The Commission said there was nothing in the record to indicate that the new rates for high-speed operation would result in excessive earnings from such facilities. The Commission said further that it knew of no requirement that a difference in rates must reflect the full difference in value of service. As we have already pointed out, the differential between $20.00 for normal-speed operation and $25.00 for high-speed operation is in line with long-existent relationships between similar rates established by Western Union and the Bell System companies. A court will not attempt to substitute its judgment for that of the regulatory commission on a matter such as this, so long as the record affords substantial basis for the agency's judgment.

■ 10. Petitioner contends the Commission erroneously based essential findings upon incompetent evidence. The claimed incompetency is that certain exhibits were not the best evidence. It appears that certain cost figures depended upon great quantities of underlying invoices and other similar original cost data. Western Union prepared and offered for identification summary exhibits. A witness for the purpose was presented for examination. All the underlying material was assembled at Western Union's New York offices, and at the end of the first day's hearing a recess for two months was ordered to enable opposing counsel to examine the material and check the accuracy of the proposed exhibits. These counsel, or their representatives, did spend several weeks at that task. Thereafter the exhibits were offered in evidence. Objection was made that they were not the best evidence. No instance of inaccuracy was advanced. The objection was overruled. We think the ruling was correct. The procedure followed was of the sort recommended by the Judicial Conference of the United States in adopting the Report (page 29) of its Committee on Procedure in Anti-Trust and Other Protracted Cases on September 26, 1951, and also recommended by the President's Conference on Administrative Procedure in its Report (Recommendation 12(b) and (c)) of March 3, 1955. The procedure applies to the problem of vast quantities of documentary material. It fully serves the purposes of the best evidence rule, affords ample opportunity for cross examination upon points actually disputed, but at the same time eliminates much unnecessary delay, expense, and volume of these records. The accurate determination of fact issues of this sort does not require the actual formal inclusion in a record of bulk material such as this was.

Petitioner presents one or two other minor points, which do not seem to require discussion.

We have studied the Commission's conclusions and the underlying findings and, upon disputed points, have gone to the evidence. Petitioner's contentions involve chiefly matters upon which the Commission was required to exercise a regulatory judgment. The bases for these judgments are readily ascertainable, and they rest upon ample evidence in the record. We find nothing which requires that this court disturb the conclusions. The order of the Commission is, therefore,

Affirmed.