WILSON & CO., Inc., Swift & Company, and Armour and Company, Petitioners,

v.

UNITED STATES of America and Federal Communications Commission, Respondents,

Aeronautical Radio, Inc., The Western Union Telegraph Company, and American Telephone and Telegraph Company, et al., Intervenors.

No. 14269.

United States Court of Appeals Seventh Circuit.

Aug. 14, 1964.

Charles A. Bane, Arthur C. Gehr, Sharon L. King, Robert Wood Tullis, Kenneth K. Howell, Edward E. Gibson, James E. Knox, Jr., Chicago, Ill., Isham, Lincoln & Beale, Chicago, Ill., of counsel, for petitioners.

Lionel Kestenbaum, Dept. of Justice, Washington, D. C., Daniel R. Ohlbaum, Federal Communications Commission, Washington, D. C., William H. Orrick, Jr., Asst. Atty. Gen., George R. Kucik, Attys., Dept. of Justice, Washington, D. C., Max D. Paglin, Gen. Counsel, Michael Finkelstein, Counsel, Federal Communications Commission, Washington, D. C., for respondents.

Howard J. Trienens, Chicago, Ill., Horace P. Moulton, John F. Preston, Jr., Ernest D. North, George E. Ashley, New York City, Kenneth F. Burgess, Howard P. Robinson, Gary L. Cowan, Chicago, Ill., Sidley, Austin, Burgess & Smith, Chicago, Ill., of counsel, for American Telephone and Telegraph Company and Bell System Associated Companies.

John R. Baskin, Cleveland, Ohio, Joseph Du Coeur, Kirkland, Ellis, Hodson, Chaffetz & Masters, Chicago, Ill., Baker, Hostetler & Patterson, Cleveland, Ohio, of counsel, for intervenor American Newspaper Publishers Association, Inc.

Joseph Du Coeur, Chicago, Ill., Kelley E. Griffith, Washington, D. C., for intervenor United Press International, Inc.

William A. McSwain, Chicago, Ill., Herbert G. Telsey, New York City, Roy W. Sears, Eckhart, McSwain, Hassell & Husum, Chicago, Ill., John H. Waters, New York City, of counsel, for The Western Union Telegraph Company, Intervenor.

Donald C. Beelar, Charles R. Cutler, Washington, D. C., for Aeronautical Radio, Inc.

Before KNOCH, KILEY and SWYGERT, Circuit Judges.

SWYGERT, Circuit Judge.

This petition for review, filed pursuant to section 402(a) of the Communications Act of 1934, 47 U.S.C. § 402(a) and section 4 of the Judicial Review Act of 1950, 5 U.S.C. § 1034, seeks to invalidate the orders of the Federal Communications Commission prescribing rates for private line telephone and telegraph services furnished by American Telephone & Telegraph Company and associated companies[1] and Western Union Telegraph Company.

1. Associated companies refers to the Bell System which consists of twenty-one state or regional operating companies, nineteen of which are wholly or principally-owned subsidiaries of AT&T. In the other two companies, AT&T has a substantial minority interest.

Private line services furnish channels for the transmission of communications, at monthly rates between locations specified by the customer. These services provide the customer continuous communication without the necessity of the carriers establishing a connection for each call or message. The basic components of private line services include: intercity channels which connect a central office of the carrier in one city with a central office in another city, local channels which connect the central office with the customer's premises, and equipment for communicating over the channels.

The Commission's order resulted in an aggregate decrease in AT&T's rates for private line telephone service and an aggregate increase in rates for private line telegraph service furnished by AT&T and Western Union.

Petitioners Wilson & Co., Inc., Swift & Company, and Armour and Company are three meat packing concerns which use both private line telegraph and telephone services. They intervened in the rate proceeding after the Commission had issued its initial decision. They challenge the Commission's final order insofar as it increases the rates for telegraph service.

AT&T, Western Union, United Press International, Inc., American Newspaper Publishers Association, Inc., and Aeronautical Radio, Inc., have been allowed to intervene in the review in this court. Western Union, in whole, and United Press International and American Newspaper Publishers Association, in part, support the Commission's final order; the others ask that it be set aside.

*The administrative proceeding*

In 1955 AT&T filed proposed tariff schedules with the Commission offering reduced rates for multiple channel private line service. Western Union filed a protest against the reduction. It claimed that the reduction would have an adverse effect on its private line business. The Commission ordered the suspension of the reduced rates and instituted an investigation of them. It notified AT&T that the carrier had to demonstrate that the new channel rates were justified by the costs of furnishing the various private line services.

While the proceeding was in recess pending AT&T's completion of the cost study, the Commission in March 1958 broadened its investigation to include all private line services offered by AT&T and Western Union except those furnished radio broadcast stations, television stations, and broadcast networks.

During this investigation, the General Services Administration, an intervenor representing the United States, petitioned the Commission to reduce AT&T's charges for private line telephone service, alleging that the carrier's cost study revealed that AT&T was deriving an excessively high rate of return. The Commission in June 1958, in granting GSA's petition in part, directed AT&T to reduce its private line telephone rates by not less than $5,700,000 per year, finding that "the charges of AT&T * * * for private line services using telephone grade channels are unjustly and unreasonably high and should be reduced." At the same time the Commission found that AT&T's return for private line telegraph services was only 2.6 per cent as of 1955 and 1.7 per cent as of 1957. The Commission observed that the telegraph rates of both AT&T and Western Union "may be inadequate to provide the respondents with a fair return."

Thereafter, AT&T and Western Union in August 1958 requested interim relief by filing revised tariffs increasing their private line telegraph rates. GSA and twenty private line telegraph users who intervened at this time (not including petitioners) objected to the proposed rates. These tariffs were subsequently withdrawn because the Commission found that the record did not support the proposed modifications even though some increase in rates was warranted.

AT&T and Western Union filed substitute tariffs in October 1958 for private line telegraph rates. The Commission conditionally authorized the rates to go into effect on December 2, 1958, subject to section 204 of the Communications

Act of 1934, 47 U.S.C. § 204, requiring the carriers to keep an account of the amounts collected so that the Commission, in its final decision, might order refunds. Under the revised interim tariffs, the level of private line earnings of both AT&T and Western Union increased to about 5.9 per cent.

The administrative record was closed in September 1959. The hearing officer in January 1960 certified without decision the record to the Commission in accordance with the Commission's direction. The Commission's initial decision was filed July 6, 1961. The decision prescribed a complete revision of the rate structure for all private line telephone and telegraph services furnished by AT&T and Western Union. A number of users requested the Commission to reconsider, including petitioners who intervened in the administrative proceeding after the Commission had issued its initial decision.

All petitions for reconsideration were denied except those filed by American Newspaper Publishers Association and United Press International. The Commission said that the petitions of the press raised "substantial questions regarding the impact which changed private line telegraph and * * * telephotograph rates * * * would have upon the dissemination of news information." The Commission excepted the press from its final order and inaugurated further investigation to determine if the new rates would "impair * * * the dissemination of news." As to all other users of private line telephone and telegraph services, the Commission ordered the rates prescribed in its initial decision to be effective as of August 1, 1963.

*The Commission's decision and order.*

Except for the exemption granted the press, the final decision, dated May 29, 1963, affirmed without significant modification the initial decision. The order increased the carriers' rates for private line telegraph service and decreased AT&T's private line telephone rates.

The Commission discussed extensively AT&T's and Western Union's cost studies, as adjusted by the Commission. It was the opinion of the Commission that the cost of providing services constituted the most reliable criterion available to determine reasonable and nondiscriminatory rates. The Commission said that it would regard costs either as directly controlling or as reference points from which to measure the extent of any departure therefrom based on other rate making considerations.

The Commission concluded that the proper level of private line earnings was 9 per cent for Western Union and 7.25 per cent for AT&T. It held, however, that it could not prescribe rates for Western Union which would give it a 9 per cent overall level of earnings because the evidence indicated that AT&T had lower costs for the service and to permit Western Union to obtain a 9 per cent return would require either raising Western Union's rates so high as to be noncompetitive or raising AT&T's rates above the level necessary to obtain a 7.5 per cent overall return. The Commission found both solutions undesirable because the "ratepayers are entitled to benefits from competitive service offerings by the carriers," and it was determined to avoid "burdening the ratepayer with higher rates for complete telegraph service than would otherwise obtain if AT&T were the sole carrier." Accordingly, the Commission authorized Western Union to charge rates which if charged by AT&T would permit it to earn at a 7.25 per cent level, thereby limiting Western Union to a 6.4 per cent level of earnings. The Commission concluded that the prescribed rates should result in reasonable earnings for both carriers.

The Commission affirmed its conclusion reached in its initial decision that it must prescribe specific rates for competitive units of private line telegraph services rather than to permit, as AT&T urged, the carriers to set their own rates as long as their total returns did not exceed the levels found reasonable.

Finally, the Commission eliminated the clock-hour schedule and minimum period rate provision. AT&T and Western Union had provided private line telegraph service to customers on a monthly contract basis for one or more days a week and for a minimum period of eight hours a day. Daily charges were scaled down as the number of days of service per week increased. As the number of hours of use per day over eight increased, the rate per hour decreased. Superimposed upon this rate structure was the clock-hour schedule, which divided the day into four periods and established a different rate per hour within each period. The period with the highest rate covered the normal business day, 9 a. m. to 6 p. m. The lowest rate applied to the period between 12 a. m. and 6 a. m.

Abolishing both the minimum period provisions and the clock-hour schedule, the Commission imposed the requirement that all private line telegraph service should be offered on a continuous monthly basis, seven days a week, twenty-four hours a day. The Commission found that, "[T]here is little, if any, difference in the cost of furnishing service during the day or night." Furthermore, the Commission noted that ordinarily telegraph channels furnished for daytime-only leases were not used by another customer at night. Concerning the minimum period provisions, the Commission held that "differences in the rates for minimum period and continuous services are not justified by cost differences" since the costs of providing continuous service has not been substantially greater than for minimum period service.

Petitioners attack the final order, claiming procedural errors on the part of the Commission, and, on the merits, contending that the order is not supported by adequate findings or the record.

*Procedural aspects.*

Petitioners challenge the Commission's order on the procedural grounds that they did not receive adequate notice of the proceeding, that the participation by the Commission's Common Carrier Bureau counsel in the decision of the agency violated the Communications Act of 1934, the Administrative Procedure Act, and the Commission's own rules of practice, and that the Commission erroneously denied ratepayers the right to cross-examine witnesses on the issue of the carriers' cost of service.

■ We disagree with the Commission that petitioners waived their right to raise these questions in this court for failure to raise them in the administrative hearing. We do not think petitioners had to raise the issues of adequacy of notice and the right of cross-examination as long as these issues were raised by a party to the proceeding during the hearing. The reason for the rule that such questions should not be raised initially in the court of review is that the administrative agency ought to have the opportunity to rule on the questions in the first instance. Hennesey v. S. E. C., 285 F.2d 511 (3d Cir. 1961).

■ Petitioners did not object at the administrative hearing to the ex parte participation by Commission counsel in the decision of the Commission but have raised the issue by affidavits for the first time in this court. We think the affidavits properly present the question. Cf. Massachusetts Bay Telecasters v. F. C. C., 104 U.S.App.D.C. 226, 261 F.2d 55 (1958); WKAT, Inc. v. F. C. C., 103 U.S.App.D.C. 324, 258 F.2d 418 (1958). We are not persuaded by the argument of the Commission and AT&T that petitioners were on notice during the hearing that such participation might occur and hence should have filed their objections with the Commission.

We turn to the merits of these issues.
*Notice.*

The issue is raised whether the final order is invalid because the Commission's notice in the Federal Register announcing the investigation of the carriers' private line rates failed to apprise interested parties or the public of the issues to be considered in the hearing. Petitioners contend that there was no "description of the subjects and issues

involved" as required by sections 2(c) and 4(a) of the Administrative Procedure Act, 5 U.S.C. §§ 1001(c), 1003(a); the notice "described the issues solely in the language of the Communications Act"; and that even if the initial notice was adequate, there was no notice of the added issues created during the proceeding in 1958 when the Commission conditionally increased the rates for private line telegraph services and ordered the carriers to account for the increase in order to facilitate possible refunds. Such action, they say, substantially altered the proceeding, requiring notice of the rate hearing in a more specific manner than was given.

■ The Commission's order of March 7, 1956, published in the Federal Register, enumerated each of the private line rates subject to investigation and stated that AT&T was requested "to conduct a study to determine the cost in furnishing private line services and channels." The Commission noted that "it is desirable to determine in a single proceeding the lawfulness of all tariff schedules applicable to private line services and channels." The notice included as issues to be investigated: whether there existed within the tariffs then in effect unreasonable discriminations or preferences, unreasonable rates, and if the Commission should prescribe new rates. The notice adequately apprised all interested parties of the Commission's intention to conduct a general investigation of the private line tariffs of AT&T and Western Union, of the lawfulness of the carriers' rates, and the possibility of prescription of new rates.

■ The notice was not, as petitioners contend, a statement of issues in general statutory language of legislative delegation of authority. It was as specific as the Commission could have made it at the time. Accordingly, we hold that the publication was sufficiently detailed to give notice that broad rate adjustments for telegraph services were to be the subject matter of the investigation

and, therefore, constituted adequate notice as required by the Administrative Procedure Act. The interim rate increase and the accounting order did not add new issues to the proceeding requiring additional notice although, in fact, the Commission announced the procedure it would follow in determining the lawfulness of the interim rates in a memorandum opinion, dated January 28, 1959, and published in the Federal Register.

We conclude that petitioners' contention of lack of notice is without merit.

*Denial of right to cross-examine witnesses.*

Three intervenors, General Services Administration, Aeronautical Radio, Inc., and United Press International, participated fully in the administrative hearing. The remaining parties, who intervened prior to the Commission's initial decision, were denied the right to cross-examine witnesses about the carriers' cost of service studies introduced in the hearing. The question is whether this ruling invalidated the order. Petitioners urge that the so-called limited intervenors, as ratepayers, were entitled as of right to cross-examine witnesses irrespective of the lateness of their intervention.

■ Section 2(b) of the Administrative Procedure Act, 5 U.S.C. § 1001(b), provides: "[N]othing herein shall be construed to prevent an agency from admitting any person or agency as a party for limited purposes." The Commission's rules provide that the Commission may permit intervention "limited to particular issues or to a particular stage of the proceeding." [2] We hold that it is proper for the Commission to consider lateness as a ground for limiting a party to the state of the proceeding at the time he intervenes.

In the circumstances of this case, we perceive no prejudice to these late-filing intervenors resulting from the limitation on cross-examination. The cost phase of the investigation had been substan-

2. 47 C.F.R. § 1.104(d) (now § 1.223(d), 28 Fed.Reg. 12426).

tially completed when they intervened. Other ratepayers who intervened early in the proceeding subjected the cost evidence to examination. To have permitted the late-filing intervenors to plow the same ground would only have delayed the hearing unduly.

■ We do not agree that the Commission's November 25, 1958 order permitting interim rates subject to refund constituted the initiation of a new proceeding that required the Commission to allow the limited intervenors to participate fully. Section 204 of the Communications Act, 47 U.S.C. § 204, provides that, "[I]n case of a proposed increased charge, the Commission may by order require * * * account * * * and * * * refund." In considering the question of possible refunds, the Commission did not institute a new proceeding; it merely added an ancillary question to be considered in the hearing. Consequently, the November 1958 order did not affect the timeliness of the petitions for intervention to give the limited intervenors the right to participate fully.

In their request for leave to intervene, petitioners made no offer to prove or disprove disputed facts. Rather, they limited their objections to the Commission's conclusions drawn from the primary facts submitted to the agency. For this reason alone, their complaint has no merit. Petitioners attempt to assert rights which they claim belong to other parties. We do not believe they should be accorded the rights the limited intervenors may have, resulting from the denial of cross-examination, when peti-

tioners do not claim the right of cross-examination for themselves.

*Ex parte participation by agency counsel.*

We hold that it was proper for members of the Commission's Common Carrier Bureau who were counsel of record in the hearing before the Commission to participate in the decisional process that led to the orders under review; and that this conduct did not violate section 3(a) of the Administrative Procedure Act, 5 U.S.C. § 1002(a), sections 409(c) and 205(a) of the Communications Act of 1934, 47 U.S.C. §§ 409(c), 205(a), the Commission's own rules, as well as constitutional due process.

■ Petitioners' principal argument is that section 409(c) of the Communications Act [3] applied to the instant proceeding because the investigation concerned the validity of rates then in effect, as distinguished from prescribing rates to become effective in the future; that the section renders the proceeding an "adjudication" within the meaning of the Administrative Procedure Act. Referring to the Administrative Procedure Act, petitioners point out that section 2(c) of the act, 5 U.S.C. § 1001(c), defines rulemaking as including the "prescription for the future of rates" ; that since adjudication is defined by section 2(d) of the act, 5 U.S.C. § 1001(d), to be any proceeding not included within the definition of rulemaking, the determination of the validity of rates currently effective is necessarily adjudication; that this interpretation of adjudication is buttressed by section 5 of the act, 5 U.S.C. § 1004.

---

3. Section 409(c) (3) provided in part:
"No person * * * engaged in the performance of investigative or prosecuting functions for the Commission * * * shall advise, consult, or participate in any case of adjudication (as defined in the Administrative Procedure Act.)"
On August 31, 1961, section 409(c) was amended, deleting the above subsection. However, section 409(c) (1) incorporated the ex parte participation provisions as follows:

"In any case of adjudication (as defined in the Administrative Procedure Act) * * * no person who has participated in the presentation * * * of such case at the hearing or upon review shall (except to the extent required for the disposition of ex parte matters as authorized by law) directly or indirectly make any additional presentation respecting such case * * * to the Commission, * * * unless upon notice and opportunity for all parties to participate."

Petitioners misconceive, however, the nature of the proceeding before the Commission. The Commission's decisions and final order come precisely within the ambit of section 2(c) of the Administrative Procedure Act; the order prescribes "for the future of rates" and therefore was the result of a rulemaking proceeding. The order is not retroactive because the new rates do not go into effect until the order is operative. The question of the validity of the existing rates was ancillary to the primary question of whether new rates should be prescribed. Adjudication was not included in the administrative process.

Even if the initial proceeding was rulemaking, petitioners maintain that the account and refund provisions imposed by the November 1958 order converted the investigation into an adjudicatory proceeding. Here again, the account and refund provisions were ancillary to the primary proceeding and a part of the rulemaking procedure. The interim order increasing the telegraph rates and providing for contingent refunds was of an interlocutory nature akin to a preliminary injunction. These provisions are discretionary means to save private line telegraph users harmless pending the Commission's determination of whether the future rates should be approved.

Finally, we are of the opinion that the Commission complied with section 3(a) of the Administrative Procedure Act, which provides that, "Every agency shall * * * publish in the Federal Register * * * descriptions of its central and field organization; * * * statements of the general course * * * by which its functions are channeled and determined." The Commission published a statement of organization which apprised petitioners that staff members might participate in preparation of the Commission's decision.[4] The procedure followed by the Commission and its staff did not run counter to statutory requirements. Moreover, the Commission did not violate its own rules nor did the procedure constitute a denial of due process.

Aside from the claimed procedural defects, petitioners attack the validity of the Commission's decisions and order on their merits.

*Rate of return.*

Petitioners contend that the Commission's "allowance for return" is excessive, contrary to law, and not supported by evidence. In the Commission's decision the rate of return on the carriers' investments, more precisely the carriers' level of earnings of private line services, was found to be 6.4 per cent for Western Union (adjusted by the Commission from 9 per cent) and 7.25 per cent for AT&T. In making this finding, the Commission used cost of capital as the basic factor. It had concluded from the evidence that the cost of capital of the private line facilities for AT&T was from 6 to 6.5 per cent and for Western Union 7.5 per cent.

Contrary to what petitioners urge, the evidence, when considered in its totality, substantially supports the Commission's findings. Even though the Commission may not have heard expert testimony on the cost studies, a sufficient amount of statistical data was submitted from which the Commission could decide the carriers' cost of capital.

Moreover, the Commission did not go outside the record and depend upon a previous rate case, the so-called Landline case, 25 F.C.C. 537 (1958), in arriving at Western Union's cost of capital. What the Commission said was that Western Union's cost of capital (7.5 per cent) was the same as its cost of capital in Landline.

In contending that a more extensive cost study should have been undertaken, petitioners overlook the fact that only segments of the carriers' operations were under investigation. The criteria in determining the reasonable-

4. Section 0.21(d), 47 C.F.R. § 0.21(d) (now 28 Fed.Reg. 12397), states that the Common Carrier Bureau "assists, advises and makes recommendations to the Commission."

ness of rates for a particular segment of a utility's operation are different from the criteria to be applied when the level of earnings of an entire business is considered. Chicago Board of Trade v. United States, 96 U.S.App.D.C. 56, 223 F.2d 348 (1955). For these reasons, we think the Commission correctly adduced that it was unnecessary to make findings or hear evidence in the detail otherwise required for rate of return conclusions.

 Using the cost of capital findings as reference points, the Commission also considered the value of AT&T's and Western Union's services to users; risk of discontinuance of service by users for whom costs were incurred in acquiring and constructing specially designed facilities; competition between private line and message services; effect of private line services on the companies' stability; and competitive relationship between private microwave systems and leased services. It was proper for the Commission to consider these factors in determining the carriers' level of earnings.

The Commission noted that private line service is of "great value to users having specialized or bulk communication requirements," and that "private line services derogate from the usage of the message services, which constitute the largest single service offering of each carrier." Although the Commission said that it made some allowance for these factors in determining the level of earnings, it rejected the carriers' claim that these factors warranted a 10 per cent level of earnings for private line services.

 Petitioners contend that the Commission's consideration of the value of service to consumers is contrary to this court's holding in Natural Gas Pipeline Co. of America v. F. P. C., 120 F.2d 625 (7th Cir. 1941), rev'd on other grounds, 315 U.S. 575, 62 S.Ct. 736, 86 L.Ed. 1037 (1942). That case, however, dealt with the entire business of the utility, not a particular segment. Although we said there that the value of service to the users is not "a reasonable rule," we also said that "the rate of return not only may, but in a utility case,

must be, the *largely* determinative factor of reasonableness." (Emphasis added.) The Commission followed the rule enunciated in that case in the instant proceeding. Value of service was only one of the factors used to determine a reasonable level of earnings.

We disagree with petitioners' contention that a consideration of the factors (other than the cost of capital) would result in a conclusion contrary to what the Commission found. Rather, we are convinced that the Commission's consideration of these factors in conjunction with cost of capital could reasonably have resulted in the finding that the level of earnings for AT&T was 7.25 per cent and for Western Union 9 per cent, adjusted to 6.4 per cent.

*Cost allocation.*

Petitioners contend that the Commission erred in allowing rate increases on the basis of cost allocation not supported by adequate findings or by the evidence; that the increase was based in major part upon AT&T's cost study which allocated to private line telegraph service a disproportionate amount of high-cost facilities and only a de minimus amount of low-cost radio relay facilities.

AT&T uses eight types of intercity circuits that differ in their technical characteristics and vary in average book cost from a low of $19.20 per circuit mile to a high of $174.70. Voice frequency cable has an average book cost of $129.14, K-carrier a cost of $44.82, and radio relay a cost of $19.20. The AT&T cost study as of December 31, 1955 indicated the types and the extent of circuits actually being used for private line telegraph intercity service. The study showed that 52.4 per cent of its telegraph service was provided by K-carrier, 17.1 per cent by voice frequency cable, and 0.1 per cent by radio relay.

Petitioners say the assignment to private line service of one-tenth of 1 per cent was disproportionate and resulted in increasing the cost of the circuits allocated to private line service by 26 per cent since radio relay circuits constituted 28.4 per cent of the total circuits used by AT&

T for all its services as of December 31, 1955. Further, it is petitioners' position that inasmuch as the allocation of the telegraph service furnished by AT&T was based on engineering criteria employed by the company and the Commission said that it was not called upon and the record would not enable it to pass upon the "absolute validity" of the engineering criteria, the Commission did not make findings on the issue of cost allocation; that its failure to do so violated section 8(b) of the Administrative Procedure Act, 5 U.S.C. § 1007(b). Moreover, petitioners say that the evidence establishes that the allocation was contrary to actual usage and, therefore, arbitrary. In support of this proposition, they allege that in order to meet competition from privately-owned microwave systems, AT&T twice reduced its rates for large volume users of telegraph channels, initially by filing the multiple channel tariff in September 1955, and subsequently by the "telpak" tariff filed in January 1961;[5] that "if microwave or radio relay systems were too unreliable for telegraph use, it would have been unnecessary for AT&T to lower its private line telegraph rates to meet competition from such service."

■■■ The telpak evidence, however, is not in the record, nor was it offered into evidence by petitioners. A judicial review of an administrative order must be based solely upon the record made before the agency. Section 7(a) of the Administrative Procedure Act, 5 U.S.C. § 1037(a); Radio Corp. of America v. United States, 95 F.Supp. 660 (N. D.Ill.1950), aff'd, 341 U.S. 412, 71 S.Ct. 806, 95 L.Ed. 1062 (1951). Consequently, the telpak testimony may not properly be considered in this review.

■■■ There is no showing that the Commission abused its discretion in not reopening the proceeding to allow the testimony adduced in Telpak. As the Supreme Court said in I. C. C. v. City of Jersey City, 322 U.S. 503, 64 S.Ct. 1129, 88 L.Ed. 1420 (1944), there is always a gap between the time the record is closed and the time the agency makes its decision and that, if every new circumstance or fact were to be the basis of a reopening of the administrative proceeding, "there would be little hope that the administrative process would ever be consummated."

In its initial decision the Commission said that in apportioning costs among the several kinds of service provided by a communication carrier the relative use of each service should be considered, and "to the extent that a particular type of plant is used for a particular service in greater proportion than it is used for another service, the relative costs of that type of plant should be reflected proportionately in the costs of furnishing the service in which it has the greater amount of use."

The Commission, however, did not rely on the apportionment of services submitted by AT&T in the cost study without examination. It examined the basis of these assignments to see whether they were arbitrarily made or were reasonably related to the requirements of private line telegraph service. From such examination, the Commission determined that radio relay was not as reliable for private line services as the more expensive circuits. It also found that the high terminal cost necessary in the use of radio relay made this type of service uneconomical when the distance to be covered was less than 200 miles; moreover, the average length of private line telephone circuits was about 250 miles.

■■■ We are satisfied from a consideration of the whole record that the cost allocation found by the Commission was not arbitrary; that it had a rational basis in the evidence; and that it was supported by adequate findings. We think the Supreme Court's observation in Colorado Interstate Gas Co. v. F. P. C., 324

---

5. Under the telpak tariff, AT&T offers various private line intercity channels under new rate schedules which provide for a volume discount. That tariff is currently under investigation by the Commission.

U.S. 581, 589, 65 S.Ct. 829, 823, 89 L.Ed. 1206 (1945), is apt here: "Allocation of costs is not a matter for the slide rule. It involves judgment on a myriad of facts. It has no claim to an exact science."

*Alteration of rate structure.*

Petitioners argue that the elimination of the clock-hour schedule and minimum period provision and the exclusion of the press from the new rate structure were arbitrary and not supported by either the evidence or adequate findings.

Petitioners say that the clock-hour schedule and minimum period provision have been included in the tariffs for private line telegraph service furnished by AT&T and Western Union for forty years; that the provisions benefit the normal commercial customer and their elimination would have a severe customer impact. They urge that the Commission failed to consider or make findings concerning customer impact. Further, they question the Commission's conclusion "that the differences in the rates for minimum period and continuous services are not justified by cost differences."

■ The Commission's avowed reason for these alterations in the rate structure is that costs should primarily control rates. It found that "costs of providing continuous service are not substantially greater than for minimum period service," that "there is little, if any, difference in the cost of furnishing service during the day or night," and that "ordinarily telegraph channels furnished for daytime-only leases are not placed in service at night."

We are convinced that on the basis of these findings the Commission was warranted in ruling that the private line telegraph rates were "unreasonably discriminatory" and "should be determined independently of the time of day or night in which service is furnished."

AT&T supports petitioners' contention. Although the company concedes that the finding of substantial identity of cost for minimum and continuous service is "fully supported by the evidence," it says that the Commission should have considered customer impact (value of service), and that had it done so, it would not have altered the rate structure.

■ The Commission, however, was cognizant of the impact on customers. It said: "We are aware that changes in the telegraph rate structure * * * will result in substantial increases to certain customers and in reductions to others." There is no indication in the record that the carriers would lose customers to other services or that the customers would be significantly affected economically by these changes. The weight to be given customer impact by the Commission in these circumstances is a matter for expertise competence and is discretionary.

It is also urged that the Commission acted arbitrarily in continuing the proceeding to determine whether special rates should be prescribed for the press. However, section 201(b) of the Communications Act, 47 U.S.C. § 201(b), sanctions this procedure. That section provides: "[C]ommunications by wire or radio subject to this chapter may be classified into day, night, * * * commercial, *press*, Government, and such other classes as the Commission may decide to be just and reasonable, and different charges may be made for the different classes of communications." (Emphasis added.)

■ In staying the operation of the new rates as applied to the press, the Commission said: "On the basis of the record made in these proceedings * * * we are unable to evaluate the extent to which such changed [private line telegraph] rates, if applied to the press, would impair the widespread dissemination of news information." In support of this statement, the Commission said that it was "in the public interest to institute a separate investigation * * * to determine whether the imposition of the same charges applicable to other users would significantly impair the widespread dissemination of news information." In view of section 201(b) which gives the Commission discretion to place the press

in a different rate classification and the agency's statement, the Commission's action was not arbitrary or discriminatory.

We find no error in the other rate changes about which complaint is made nor do we think it necessary to discuss them.

The petition to set aside the Commission's orders is denied.