The **COPLEY PRESS, INC.,** Field Enterprises, Inc., and Los Angeles Times-Washington Post News Service, Petitioners,

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,

American Newspaper Publishers Association et al., Intervenors.

No. 24395.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 25, 1971.

Decided May 12, 1971.

Wilkey, Circuit Judge, concurs in result.

Mr. Aloysius B. McCabe, Washington, D. C., with whom Messrs. Donald C. Beelar, John L. Bartlett, Washington, D. C., Gerald D. Stern and Robert D. Larsen, New York City, were on the brief, for petitioners.

Miss Katrina Renouf, Counsel, Federal Communications Commission, for respondents. Messrs. John H. Conlin, Associate General Counsel, Edward J. Kuhlmann, Counsel, Federal Communications Commission, and Howard E. Shapiro, Atty., Department of Justice, were on the brief for respondents. Mr. Henry Geller, General Counsel, Federal Communications Commission, at the time the record was filed, also entered an appearance for respondents.

Mr. Hugh B. Cox, Washington, D. C., with whom Mr. Michael Boudin, Washington, D. C., was on the brief, for intervenor, American Telephone and Telegraph Co.

Mr. Donald C. Beelar, Washington, D. C., was on the brief for intervenor, American Newspaper Publishers Assn.

Mr. Aloysius B. McCabe, Washington, D. C., also entered an appearance for intervenor, American Newspaper Publishers Assn.

Messrs. Donald C. Beelar and John L. Bartlett, Washington, D. C., were on the brief for intervenor, The Associated Press.

Messrs. Harry J. Ockershausen, Washington, D. C., and John R. Baskin, Cleveland, Ohio, were on the brief for intervenor, United Press International, Inc.

Mr. Jack Werner, Washington, D. C., was on the brief for intervenor, Western Union Telegraph Co., Mr. Bartley A. Brennan, Washington, D. C., also entered an appearance for intervenor. Western Union Telegraph Co.

Before TAMM, ROBB and WILKEY, Circuit Judges.

TAMM, Circuit Judge:

In this case we are asked by petitioners [1] to review a decision [2] of the Federal Communications Commission (hereinafter "the Commission") sustaining an initial decision of its examiner following evidentiary hearings. The issue to be determined is whether the Commission was correct in not affording press users rates more advantageous than those paid by all other commercial customers for certain private line services offered by American Telephone and Telegraph Company (hereinafter "AT&T") and Western Union Telegraph Company (hereinafter "Western Union"), who also are intervenors in this proceeding. For the following reasons, we affirm the decision of the Commission.

Necessary to a full understanding of this case is a brief analysis of what has transpired in the several years prior to

---

1. Petitioners here are the Copley Press, Inc., Field Enterprises, Inc., and the Los Angeles Times-Washington Post News Service. Intervenors in support of petitioners are the American Newspaper Publishers Association (hereinafter "ANPA"), the Associated Press and United Press International. These are all newswire services or the parent corporations of such services, which provide hundreds of papers throughout the country with up-to-date news reports and similar material.

2. A. T. & T. et al., 24 F.C.C.2d 565 (1970), aff'g hearing examiner's initial decision, 25 F.C.C.2d 5 (1969).

this controversy. Our study must then begin with a proceeding that has been commonly referred to as the Private Line Case, 34 F.C.C. 244 (Initial Decision 1961), 34 F.C.C. 217 (Final Decision 1963), modified 34 F.C.C. 1094 (1963), aff'd *sub nom.* Wilson & Co. v. United States, 335 F.2d 788 (7th Cir. 1964), cert. denied as to points here relevant, 380 U.S. 951, 85 S.Ct. 1082, 13 L. Ed.2d 968 (1965). In this proceeding the Commission, after a thorough investigation, ordered rate increases for private line telegraph and telephotograph services. These rates were prescribed for "general application." Private Line Case, *supra,* 34 F.C.C. at 369. The cost to AT&T and Western Union of providing the service to the press was determined to be, if anything, higher than providing the same service to other users of the private line telegraph and telephotograph systems. Because of this, and since it could not point to any "affirmative policy of the U. S. Government which would require lower private line rates for the press than for other users" (*Id.*), the Commission "concluded that the record * * * [did] not support [the application of] special press rates, either for private line telegraph or telephotograph services." Private Line Case, *supra,* 34 F.C.C. at 370. On reconsideration, however, the Commission instituted "a separate investigation of the charges to the press for private line telegraph and telephotograph services to determine whether the imposition of the same charges applicable to other users would significantly impair the wide-spread dissemination of news information, and, if so, to determine whether we should prescribe or authorize different charges for the press, and, if so, what

such charges should be." Private Line, Case, *supra,* 34 F.C.C. at 1098. The Commission left undisturbed its prior finding that the rates as applied to the press were otherwise unobjectionable. It was only because the petitions before the Commission raised "substantial questions regarding the impact which changed * * * rates * * * would have upon the *dissemination of news information*" and the Commission's awareness of the "public interest" involved in this question that the Commission held an investigation to determine whether the press was entitled to a separate rate classification as authorized by section 201(b) [3] of the Communications Act of 1934 (hereinafter "the Act"). (*Id.*) Pursuant to its decision to hold the above-mentioned investigation, the Commission shortly thereafter issued the following order:

\* \* \* \* \* \*

*It is ordered,* That pursuant to sections 201, 202, 205, and 403 of the Communications Act of 1934, as amended, an investigation is hereby instituted into the lawfulness of the existing rates for private line telephotograph services furnished to the press contained in Tariffs F.C.C. Nos. 140 and 208 of the American Telephone and Telegraph Company and Tariff F.C.C. No. 237 of the Western Union Telegraph Company;

*It is further ordered,* That the investigation shall be *limited* to the following issues:

1. The extent to which the rates for private line telegraph and private line telephotograph services prescribed in our decision in Docket Nos. 11645 and 11646 for users other than press users would, if applied to press users, *im-*

---

3. Section 201(b) provides in pertinent part:

  All charges, practices, classifications, and regulations for and in connection with such communication service shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful: *Provided,*

That communications by wire or radio subject to this chapter *may be classified* into day, night, repeated, unrepeated, letter, commercial, *press,* Government, and such other classes as the *Commission may decide to be just and reasonable.* \* \* \*
47 U.S.C. § 201(b) (1964) (Emphasis added.)

*pair the widespread dissemination of news*;

2. Whether, *in the light of the evidence adduced on the foregoing issue*, the rates presently applicable to press users of the above-mentioned services are just and reasonable within the meaning of section 201(b) of the Communications Act of 1934, as amended, or whether they are unjustly discriminatory or unduly preferential or advantageous within the meaning of section 202(a) of such Act;

3. Whether *in the light of our determinations on issues 1 and 2* the Commission should prescribe minimum or maximum or minimum and maximum rates to be applied to press users of the above-mentioned services and, if so, what rates should be prescribed:

\* \* \*

28 Fed.Reg. 5540, 5541 (1963) (Emphasis added.) It was pursuant to the above directions of the Commission and the approval of the Seventh Circuit[4] that the investigation now under review by us was initiated. The issues to be decided have remained substantially the same throughout, although the record at one point was reopened and the issues revised to allow consideration of the effect that subsequently added 1967 rates for non-press users would have upon the *widespread dissemination of news* if applied to the press. Nowhere, however, was it ordered that the reasonableness of the 1967 rates in their general application was to be determined in the proceeding now under review, but rather the proceeding was to remain one of determining the propriety of establishing "a special press rate classification." A. T. & T. et al., 11 F.C.C.2d 689, 694 (1968).

With the above-mentioned history as background we can more intelligently discuss the main issues involved in this appeal. The first problem that arises is determining who has the burden of ultimate persuasion in a proceeding of this nature. Must the press parties affirmatively show that the widespread dissemination of news will be impaired or is it only necessary, as they claim, for them to merely come forward with some meager evidence which thereby shifts the burden of persuasion to the carriers? The press parties also argue that, if the burden of ultimate persuasion is to be placed on their shoulders, they have nevertheless borne it successfully.

■ Petitioners rely on section 204 of the Act, 47 U.S.C. § 204 (1964), as authority for placing the burden of proof upon the carriers. This section provides in pertinent part:

> At any hearing involving a charge increased, or sought to be increased, after the organization of the Commission, the burden of proof to show that the increased charge, or proposed increased charge, is just and reasonable shall be upon the carrier \* \* \*.

47 U.S.C. § 204 (1964). Any reliance by petitioners on this section of the Act is warrantless. The proceeding now under review was by no means a section 204 hearing to determine whether an increased charge was just or reasonable. The reasonableness of the rates is not now our concern, but rather was the object of long and meticulous attention of, and ultimate decision by, commissioners and judges from 1956 through 1964.[5] Private Line Case, *supra*. The purpose of this proceeding was merely "to determine whether the imposition of the same charges applicable to other users would significantly impair the widespread dissemination of news information, and, *if so*, to determine whether we should prescribe or authorize different charges for the press, and, *if so*, what such charges should be." Private Line Case, *supra*, 34 F.C.C. at 1098. (Emphasis added.) By the mere reading of the above-quoted

---

4. Wilson & Co. v. United States, 335 F.2d 788 (7th Cir. 1964).

5. As previously mentioned, new rates were established in 1967 for non-press users and despite this nowhere was it ordered that the reasonableness of those rates were to be determined in the proceeding under review.

sentence it becomes blatantly clear what the proceeding now under review was to entail. First, the Commission was to determine whether the widespread dissemination of news information would be impaired. If it held against the press parties on this issue, then the task of the Commission was completed. It was only *if* the Commission found an impairment on the widespread dissemination of news information that they were to even consider the question of "different charges for the press." Furthermore, the word "different" here does not mean an "increased charge" in the sense of section 204 of the Act; it refers only to a separate classification "different" from non-press users. In fact, in none of the Commission orders is section 204 even mentioned. It was termed in simple language in all of the Commission's orders as a section 201(b) [6] proceeding. Construction of the Commission's language as calling for a section 204 "increased charge" proceeding, thereby placing the burden of proof on the carriers, simply cannot be justified.

Since section 204 is not applicable in this proceeding, petitioners must rely on other grounds to avoid being saddled with the burden of ultimate persuasion. To determine who has the burden, it is helpful to analyze what must be proved. The petitioners are supplemental newswire services essentially supplementing, amplifying and augmenting the immediate on-the-spot reports provided by the Associated Press and United Press International through interpretative in-depth reporting of news events. The supplementals provide their parent corporations and member newspapers with these news reports. They also provide this service to any other newspaper who wishes to subscribe. It is alleged by the press parties that the rates currently in effect for non-press users, if applied to the press, would cause the news services to either discontinue the service or raise their prices and as a result lose subscribers. In either event, they claim, there is a significant impairment on the widespread dissemination of news. To solve these issues there must be a *factual* inquiry. Also true is that there certainly can be no impact on the dissemination of news unless petitioners stop disseminating news or their customers ask them to stop disseminating it. Obviously, petitioners are the only ones who can provide information on these matters so crucial to their claim. [7] This being true, they must necessarily bear the burden of ultimate persuasion. It is petitioners who are requesting the exception, and even when the public interest is involved the burden of proving the exceptional facts rests with the proponents of such exception. [8] *See* Philadelphia Co. v. S.E.C., 85 U.S.App.D.C. 327, 333, 177 F.2d 720, 726 (1949). This is especially true in a case such as this, where there is a countervailing public interest in equal

---

6. *See* footnote 3, *supra.*

7. Petitioners, themselves, at oral argument stated:

   Facts concerning adverse impact of news dissemination were obviously peculiarly within press parties' knowledge. They knew how much they would be hurt.

8. In Office of Communication of the United Church of Christ v. F.C.C., 138 U.S. App.D.C. 112, 425 F.2d 543 (1969), the court held that the Commission had an affirmative duty to help develop the record when an intervenor had raised a serious public interest question. In so doing the court refused to place the burden of proof on the intervenor. This case can readily be distinguished from ours. Unlike our case "the type of information [sought was] particularly in the control and at the disposal of [someone other than the intervenor]" (*Id.* at 116 n. 8, 425 F.2d at 547 n. 8). Furthermore, the Commission, as will be seen later, did not, as it did in *United Church of Christ,* "sit back and simply provide a forum for the intervenors" (*Id.* at 116, 425 F.2d at 547), but specifically requested of the petitioners, through its Common Carrier Bureau, the only actual evidence that possibly could have aided petitioners' case.

prices for the same services.[9] *See* American Trucking Association, Inc. v. F.C.C., 126 U.S.App.D.C. 236, 245, 377 F.2d 121, 130 (1966), cert. denied 386 U.S. 943, 87 S.Ct. 973, 17 L.Ed.2d 874 (1967). *See also* 47 U.S.C. § 202(a) (1964). In view of the above, and moreover, because petitioners have failed to point to or even suggest any relevant evidence not in their possession, we hold that the burden of ultimate persuasion was properly placed on the petitioners.

Having now put the burden of ultimate persuasion on the petitioners, it is our task to determine whether there is a rational basis for the Commission's decision that petitioners failed to meet their burden. If petitioners can show either that some of them, because of the increased wire costs, will be forced to discontinue their wire services or that, if these increased wire costs are passed on to their customers, a substantial number of these customers will cancel their subscriptions, then and only then can petitioners be said to have met the ultimate burden of persuasion. Petitioners failed in both respects. Though the percentage increases of charges to the newswire services for telegraph and telephotograph services were in some cases great, in no case was it shown that the total cost under the new rates would amount to more than one percent of the total operating costs of the supplemental wire services' parent corporations. It is reasonable to assume, and thus proper for the Commission to hold, that such a small increase in operating costs would not cause the parent corporations to discontinue their news services. The fact that most of the supplemental news services have been money-losing operations for years and have still been retained is evidence of their value to the parent and thus, of the unlikelihood of their discontinuance when such a small increase is involved. Now let us examine the *factual* evidence brought forth by the press parties

with regard to their plan to pass on the increased rates by way of increased charges to their subscribers and which subscribers they expect to lose after such increase. Despite the request of the Common Carrier Bureau (App. 154), absolutely no persuasive evidence on these points was forthcoming. The only evidence received remotely relevant on these points was speculative, general and unsupported by factual information. The Executive Vice-President of Field Enterprises, Inc. could only testify that "many of our existing subscribers *might* be forced to discontinue receiving our service because of these increased expenses." (App. 202) (Emphasis added.) The Manager of the Los Angeles Times Syndicate and the Los Angeles Times-Washington Post News Service likewise stated that "we *might* lose * * * a substantial number of subscribers." (App. 212) (Emphasis added.) A logical, and perhaps inescapable inference one may draw from these uncertain statements is that the news services *might not* lose any subscribers despite increased costs. Other witnesses that testified for the press parties offered no factual evidence to support their conclusion that they would lose a significant number of subscribers to their newswire services due to the increased costs. In this regard the press parties were unresponsive to the Commission's legitimate requests for "data showing present and proposed monthly charges [to their subscribers], number of stations in service and number of anticipated station cancellations because of increase in monthly charges." (App. 154, 163.) "In order to serve the basic interest of the public the Commission is entitled to insist upon more than conclusional allegations easily made and which, if accepted, entail unjustified delay and consumption of the Commission's time and energy." Folkways Broadcasting Co. v. F.C.C., 126 U.S.App.D.C. 123, 127, 375 F.2d 299, 303 (1967). It is patently obvious then that the press parties ut-

9. At the present time the same private line services provided the press are also provided to such "public interest" organizations as the American Red Cross and

hospitals. There is evidence in the record that if lower rates are provided the press, there will necessarily follow an increase of rates to these non-press users.

terly failed to carry their burden of showing there would be a significant impairment of the widespread dissemination of news.

The Commission, though not compelled to do so, also specifically affirmed the positive finding of the hearing examiner that the increased charges "would *not* diminish, limit or impair the widespread dissemination of the news."[10] A. T. & T. *et al., supra,* 24 F.C.C.2d at 567. (Emphasis added.) A study of the evidence before it also points to a rational basis for the Commission's holding on this issue. United Press International and the Associated Press will be able to avoid most of the increased charges at issue since they have converted to a less expensive method of data transmission. Also, it is a fact in the record that "despite increases in subscription charges over the years due to rising operating expenses other than the cost of wire services, United Press International and The Los Angeles Times-Washington Post News Service have experienced increases in the number of subscribers; and Field Enterprises, Inc. has suffered no significant loss of subscribers." (*Id.* at 569.) There is also evidence in the record that if a subscriber balks too strenuously when confronted with a steep proposed rate increase, the supplemental news service will attempt to negotiate an amicable settlement. *See* A. T. & T. et al. (hearing examiner's initial decision), *supra,* 25 F.C.C.2d at 16. If this is the case, then it is reasonable to assume that the supplementals will successfully seek to avoid losing as many subscribers as possible, since the pur-

pose of providing the newswire service to subscribers not owned and operated by the supplemental's parent corporations is not to make a profit but rather to help defray the costs of providing this service for their parents. We find, then, a rational basis for the Commission's decision that the widespread dissemination of news would *not* be significantly impaired.

Having carefully considered all issues discussed in this opinion and all others raised in the briefs, we hold that the Commission did not abuse its discretion under section 201(b) in failing to provide a separate rate classification for the press.

Affirmed.

Circuit Judge WILKEY concurs in the result.

---

10. It is argued that the Commission did not actually make the finding since at one point in its order the Commission stated that "[d]ue to the paucity of probative evidence introduced by the press, the extent to which curtailment of news services is likely to occur cannot be determined. * * *" A. T. & T. *et al. supra,* 24 F.C.C.2d at 568. Whether the Commission did or not is, of course, irrelevant since the press parties clearly did not meet their burden of ultimate persuasion. At any rate the Commission *did*

make such a finding (*Id.* at 567), and in making the above statement the Commission was only echoing the sentiments of one of petitioners' own witnesses, who said, "There is no way of being mechanically precise about [the prospective loss of subscribers]." (App. 287). In other words, the Commission is saying they do not know exactly how many of the hundreds of newspapers throughout the country will cancel their subscriptions, but they do know that if there are any cancellations, there will be only a few.