**NATIONAL DAIRY PRODUCTS CORPO- RATION–KRAFT FOODS DIVI- SION, Appellant,**

v.

**MISSOURI–KANSAS–TEXAS RAIL- ROAD COMPANY, Appellee.**

**No. 23740.**

United States Court of Appeals
Fifth Circuit.

Oct. 27, 1967.

James E. Coleman, Jr., of Carrington, Johnson & Stephens, Dallas, Tex., David J. Gibbons, Chicago, Ill., Chadwell, Keck, Kayser, Ruggles & McLaren, Chicago, Ill., of counsel, for appellant.

M. D. Sampels, Touchstone & Sampels, Dallas, Tex., Wm. A. Thie, John B. Webster, Dallas, Tex., of counsel, for appellee.

Before RIVES, WISDOM and GOLD-BERG, Circuit Judges.

WISDOM, Circuit Judge:

This appeal requires our interpretation of the complicated freight tariff schedule applicable to shipments made by the defendant-appellant, National Dairy Products Corporation-Kraft Foods Division (Kraft), on the Missouri-Kansas-Texas Railroad (M–K–T), the plaintiff-appellee in this action. Each of the parties charged with the duty of initiating the

court into the arcane meaning of this document describes it as "clear and unambiguous".

Kraft, a shipper of hermetically sealed foodstuffs from Chicago, Illinois, to Garland, Texas, and from Garland to Denver, Colorado, consulted the Southwestern Lines Freight Tariff Schedule, the relevant portion of which is reproduced below,[1] to compute its rates on various

1. The parties have stipulated the following: (1) the particular shipments giving rise to the controversy; (2) the tariff provision in dispute; (3) the amount Kraft claims as overcharges; (4) the amount M-K-T claims as additional freight charges; and (5) that the sole point to be adjudicated on appeal is the construction of a specific tariff provision. A simplified form of the Tariff schedule is as follows:

Supplement 69 to Tariff SW/W-2006-C

SUPPLEMENT
TO
COMMISSION NUMBERS OF OTHER ISSUING AGENT

| AGENT | NAME AND ADDRESS OF TARIFF PUBLISHING OFFICE | TARIFF |
|---|---|---|
| Western Trunk Line Committee | W. J. PRUETER 516 W. Jackson Blvd., Chicago 6, Ill. | ICC A-4287 CTC A-1180 |

CUMULATIVE INDEX OF NEW OR CHANGED ITEMS
66. The latest list of new or changed numbered items in effective supplements is published in Supplement 66. Each effective supplement issued since Supplement 66 should also be consulted.

SECTION 2

EXCEPTIONS RATINGS AND COMMODITY RATE COLUMNS

| ITEM | COMMODITY | | EXCEPTION RATING (Item 600) | COMMODITY RATE COLUMN (Item 610) |
|---|---|---|---|---|
| | Aluminum Articles, noibn. Cabinets, Dispensers, or Holders, Towel, Aluminum | Percolator Tops, Glass. Plates, Pans, Trays, Dishes or Cups, made of Alum- | | |

\* \* \* \*

NOTE 2—Necessary Hardwood and Nails for erection of sections may be included.
NOTE 3—Ratings apply when covers are of same or other materials and whether in same or separate packages.

| ITEM | COMMODITY | EXCEPTION RATING (Item 600) | COMMODITY RATE COLUMN (Item 610) |
|---|---|---|---|
| | PART 1—(Subject to Item 1500) CANNED FOODSTUFFS and other articles described. in Item 337. CL, min. wt. as follows: Min. wt. 36,000 lbs. ........ Min. wt 60,000 lbs. (Note 1) ........ APPLICATION Will only apply between stations in Southwestern Territory as described in Item 317 on the one hand and stations in Illinois Freight Association, Northern or Western Trunk Line Territories as described in Items 305, 312 and 320, respectively, on the other. | ............ ............ | F2 26 F2 27 (See Application in Part 1 of this item) |
| | PART 2—(Subject to Item 1500) Foodstuffs for human or animal consumption when contained in Hermetically sealed metal, glass or earthenware containers, with or without seasoning, flavoring or preservative additives, and when packed in liquid, vacuum packed, or condensed, also juices or concentrated (Does not apply on dry, cold-packed, frozen, fermented or carbonated Foodstuffs), CL min. wt. 60,000 lbs., viz.: CHILI CON CARNE | | |

\* \* \* \*

| ITEM | COMMODITY | EXCEPTION RATING (Item 600) | COMMODITY RATE COLUMN (Item 610) |
|---|---|---|---|
| 960-C (Continued) | other meats or sausage) and beans; rice, with or without vegetable ingredients; scrapple; tomato juice, paste, pulp or puree; tomatoes; vegetable juices, noibn; or wheat. VINEGAR (1) CL, min wt 60,000 lbs, not subject to Rule 24 of UFC (Not applicable on shipments provided for in (2)....... (2) On shipments weighing in excess of 60,000 lbs in the car, not subject to Rule 24 of UFC: On first 60,000 lbs, CL ........ On weights in excess of 60,000 lbs., CL ........ APPLICATION From station in Southwestern Territory named in Item 317 on the carriers named in Paragraph (A) below only to all stations in Kansas, Nebraska, New Mexico, Missouri and Illinois on the carriers named in Paragraph (B) below, also to stations in Colorado on carriers named in Paragraph (C) below, when via routes comprised only of one or more of those lines: (a) From or to stations on the following carriers when via routes comprising only one or more of lines shown below: | ................ ................ ................ | (F31) 225 (Note 2) (F31) 225 (Note 2) (F31) 226 Note 2 (See Application in Part 2 of this item) |

| A&LM | KCS | QA&P |
|---|---|---|
| A&S | KOG | RS&P |
| A&W | L&A | StLSF |
| AT&SF (Santa Fe) | MV | StLSF&T |
| BM&E | Mo-Ill RR | StLSW |
| CRI&P | MKT | SP |
| D&PS | MoPac | TxMx |

\* \* \* \*

shipments.[2] The rates set out under Part 1 of Item 960–C have unrestricted routing,[3] as shown in the "Application" section of that Part, so long as the specified commodity moves over lines of railroads operating in Southwestern, Illinois Freight Association, Northern or Western Lines Territories. The Tariff is published for the account of all railroads operating in the defined territories by prior agreement of each member line. Part 1, the original and only provision before 1960, applies to canned foodstuffs generally, including those hermetically sealed. A lower rate was given for cars with a 60,000 pound minimum weight than to cars with a 36,000 pound minimum weight, offering a quantity discount to the shippers. These rates were still too high to enable the railroads to compete effectively with other forms of transportation, and shippers sought the assistance of member railroads in each of the freight bureaus to have reduced rates published.

After extensive hearings before each of the freight bureaus, the proposal to reduce the rates on canned foodstuffs was rejected by a majority of the member railroads. Some of the railroads, including the M–K–T, continued to feel that a reduction in the rates was justified; these members finally took independent action and caused to be published reduced rates on hermetically sealed foodstuffs shipped on their railroads. These reduced rates were set out in Part 2 of Item 960–C and were to be available to shippers only when the commodity moved over lines of participating carriers. Under Part 2 the minimum weight per boxcar

was raised from 36,000 to 60,000 pounds, with a corresponding rate reduction as incentive for shippers to use at least 60,000-pound cars. On that weight in excess of 60,000 pounds, the rates were even lower.

The question before us concerns the scope of reference of the parenthetical phrase in the Commodity Rate Column[4] for Part 2: "See Application in Part 2 of this Item". This phrase refers the reader to a listing of those railroads participating in the Part 2 rate reduction. Kraft contends that this reference to the list of participating railroads is applicable only to that part of a shipment weighing in excess of 60,000 pounds, because the reference to this list appears immediately under that rate. Thus, under Kraft's interpretation, one shipping at least 60,000 pounds of hermetically sealed foodstuffs on any carrier participating in the entire rate schedule would be entitled to the lower rate set out in paragraph (1), but one could get the next level of reduced rates—on that portion of the shipment in excess of 60,000 pounds—only by shipping via carriers named in the Application at the end of Part 2. M–K–T argues that the "Application" phrase refers to all shipments of hermetically sealed foodstuffs covered by Part 2.

In the instant case the shipments were over connecting carriers, some of which undisputedly did not participate in the lower rate schedules on hermetically sealed foodstuffs. Kraft, interpreting the disputed language as applying only to the over 60,000 pound portion of the rate schedule, computed its payments based on the Part 2 through rate applying

---

2. The associations of freight bureaus set the rates and publish the rate schedules in accordance with rules and regulations set by the Interstate Commerce Commission. Shippers disagreeing with the legality of those rates, as published, have machinery within the I.C.C. to attack the rates and to have them changed by the I.C.C.

3. To determine whether or not a particular route exists under each part of the tariff schedule, a shipper must consult the relevant "Application" section of that part to ascertain what rail carriers are parties to that part. The rail carriers who par-

ticipate in the rates published in that part, either alone or in conjunction with other participating carriers, must form a connecting link between the origins and destinations involved. Where this exists, a "route" is established. The "Application", therefore, is merely another way of saying the "available routes".

4. The figures in the Commodity Rate Column, for example "[F2] 26", refer the reader to another portion of the tariff where the rates for shipping this particular type of freight are set out.

to shipments not in excess of 60,000, without regard to whether connecting carriers were named in the Application at the end of Part 2. The nonparticipating carriers, i. e. those not named in that Application, figured their portion of the freight charges on the basis of the old Part 1 rates and billed M–K–T, the delivering carrier, at that level. This resulted in a variance between the cumulative freight bill and the payment figure determined by Kraft and already paid to M–K–T. M–K–T sued in the district court to recover this price difference, stipulated by the parties, which M–K–T had been required to reimburse the nonparticipating railroads. Kraft counterclaimed for an alleged overcharge, the amount of overcharge also being stipulated by the parties. The district court rendered judgment for M–K–T for the rate variance and dismissed Kraft's counterclaim. We affirm.

A. Kraft argues that the contested phrase applies only to the freight rate on shipments in excess of 60,000 pounds, i. e. to paragraph (2) of Part 2. The implication of this argument is that all of the railroads in the relevant association are willing to carry hermetically sealed foodstuffs in 60,000-pound quantities at a special rate lower than that for ordinary canned goods (Commodity Rate Column reference (F31) 225), whereas only a minority of railroads, designated in the Application in Part 2, are willing to give quantity reductions for that amount shipped in excess of 60,000 pounds. It appears surprising, if not unreasonable, (1) that all the carriers in the associations participating in the tariffs would agree on one price for canned foodstuffs in general and a lower rate on hermetically sealed foodstuffs, and (2) that all of

these carriers would agree to give quantity discounts for canned foodstuffs in general, but (3) that only some of these carriers would agree to give quantity discounts for hermetically sealed foodstuffs. That this construction is being urged by Kraft, which was aware of the purpose of the rate schedule in Part 2 and of the fact that all railroads did not participate in it, is even more surprising.

B. Price Bases 225 and 226 of paragraph (2) of Part 2 stand together: 225 provides the rate level for the first 60,000 pounds on a shipment in excess thereof, and 226 provides the rate level for the weight in excess of 60,000 pounds.[5] Kraft's position, that the Application refers only to that quantity of goods travelling under Price Basis 226, would lead to the following result: There would be no freight rate applicable to the excess over 60,000 pounds where shipments in excess of 60,000 pounds were carried by a railroad not named in the Application of Part 2. Paragraph (1) by its own terms does not apply to shipments provided for in paragraph (2), i. e. "shipments weighing in excess of 60,000 lbs. in the car", and paragraph (2) contains the *only* rate in Part 2 applicable to weights in excess of 60,000 pounds. But paragraph (2) could not be used because even under Kraft's interpretation it is limited in application to the enumerated participating railroads. And it could be seriously contended that the rates given in Part 1 for a minimum weight carload of 60,000 pounds apply to that portion of a shipment of hermetically sealed foodstuffs in excess of 60,000 pounds. This construction of the tariff advocated by Kraft, therefore, would make little sense.

■ C. We recognize the complexity of the construction problem presented

---

5. Kraft asserts in its brief that "If a shipper ships hermetically sealed items solely within the limited or restricted territory, but his shipment is less than 60,-000 lbs., the same 225 rating applies." Clearly this cannot be. The first (unnumbered) paragraph under Part 2 reads: "Foodstuffs for human or animal consumption when contained in Hermetical-

ly sealed * * * containers * * * C.L. min. wt. 60,000 lbs. * * *" Paragraph (1) refers to "CL min. wt. 60,000 lbs. * * *" and paragraph (2) refers to "shipments *weighing* in *excess of 60,000 lbs.* in the car. * * *" (Our emphasis.) Thus it is clear that Part 2 simply does not apply to any shipments weighing less than 60,000 pounds.

here,[6] but we do not equate complexity with ambiguity. Apparently the placement of the Application phrase in the Commodity Rate Column, as was done on the schedule before us, though not exclusively used, is common enough in railroad rate schedules. It appears in Part 1 of Item 960–C. Were we to adopt the construction advocated by Kraft there would appear to be no Application relevant to paragraph (1) of Part 2. This seems highly unlikely. Kraft contends that the shipper has to refer to the general application section of the schedule on its first page to ascertain the route for moving freight at the lower rate provided in Part 2. We find this equally unlikely in view of the fact that Part 1 contains its own express Application, referenced in the Commodity Rate Column, even though that Application corresponds completely with the application on the front page of the schedule. Tariffs should be construed so as to avoid unjust or improbable results.

"If a tariff is subject to different constructions, an interpretation which is reasonable and consistent with the purposes of the tariff should be preferred to a construction which is impractical or which leads to absurd consequences." National Van Lines, Inc. v. United States, 7 Cir. 1966, 355 F.2d 326, 332.

[2] It may be that the Application reference can more clearly be positioned to refer to all of Part 2 of Item 960–C.[7] *Considering the rate schedule as a whole,* however, we find that the Application phrase in Part 2 unambiguously refers to any shipments of hermetically sealed foodstuffs shipped under that Part.[8] The judgment of the district court is therefore affirmed.

6. After this suit was filed Kraft counterclaimed for an overpayment made through Kraft's own miscalculation of the relevant rates under its own interpretation of the schedule.

7. A more recent schedule than the one here involved places the Application reference at the beginning of Part 2. This does simplify construction of the Application but does not imply that its prior placement rendered the reference ambiguous.

8. Kraft's contention that the other railroads covered by the schedule in question, with which Kraft has done business, have acknowledged Kraft's interpretation of that portion of the schedule under consideration here is offset and rendered unpersuasive by M-K-T's contention that the other shippers shipping under this portion of the schedule have acknowledged M-K-T's interpretation.