**The ASSOCIATED PRESS, Petitioner,**

**v.**

**The FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,**

**American Telephone and Telegraph Co., Intervenor.**

**No. 22860.**

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 28, 1969.

Decided Sept. 22, 1971.

---

4. *Cf.* Stieg v. Commissioner of Patents, 122 U.S.App.D.C. 361, 353 F.2d 899 (1965).

Mr. Donald C. Beelar, Washington, D. C., with whom Messrs. Aloysius B. Mc-Cabe and John L. Bartlett, Washington, D. C., were on the brief, for petitioner.

Mr. Edward J. Kuhlmann, Counsel, Federal Communications Commission, with whom Messrs. Henry Geller, General Counsel at the time the brief was filed, John H. Conlin, Associate General Counsel, Federal Communications Commission, and Howard E. Shapiro, Attorney, Department of Justice, were on the brief, for respondents. Mrs. Lenore G. Ehrig, Counsel, Federal Communications Commission, also entered an appearance for respondents.

Mr. Hugh B. Cox, Washington, D. C., with whom Mr. Michael Boudin, Washington, D. C., was on the brief, for intervenor.

Before TAMM, ROBINSON and ROBB, Circuit Judges.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

The Associated Press (AP), our petitioner, challenges a memorandum opinion and order of the Federal Communications Commission dismissing AP's complaint against the American Telephone and Telegraph Company (AT&T), the intervenor,[1] by which AP sought reparations for and other relief from alleged overcharges on seven interstate private line teletypewriter channels leased full-time for the transmission of news information.[2] The questions on our review,[3] as before the Commission, relate to the proper construction and the legality of AT&T's tariffs setting special press rates for the provision of that service. We uphold the interpretation which the Commission gave the tariffs and its ruling sustaining the lawfulness of the rates.

I

AT&T has for many years marketed private line service in teletypewriter and other forms of communication.[4] Service of that type, by the Commission's definition, equips subscribers "with the means of continuous communication without the necessity for the carrier to establish connections for each individual call or message."[5] Prior to 1963, press users disseminating news shared with all other commercial users the same rates for intercity private line teletypewriter channels, and those rates varied with distance and length and hour of use.[6] Part-time service drew a lower rate than full-time, and off-peak service was ratably less expensive than service during peak hours.[7] The full-period rate was $1.45.[8]

---

1. By leave granted pursuant to 28 U.S.C. § 2348 (Supp. V 1965–69).

2. Associated Press v. American Tel. & Tel. Co., 16 F.C.C.2d 277 (1968).

3. Pursuant to Communications Act of 1934 § 402(a), as amended, 47 U.S.C. § 402(a) (1964), and 28 U.S.C. § 2344 (Supp. V 1965–69).

4. For a comprehensive description of private line service, see Private Line Case, 34 F.C.C. 244, 249–251 (initial decision 1961), 34 F.C.C. 217 (final decision 1963), modified, 34 F.C.C. 1094 (1963), aff'd sub nom. Wilson & Co. v. United States, 335 F.2d 788 (7th Cir. 1964), cert. denied, 380 U.S. 951, 85 S.Ct. 1082, 13 L.Ed.2d 968 (1965), cert. granted on point not here relevant sub nom. United States v. Wilson & Co., 380 U.S. 950, 85 S.Ct. 1091, 13 L.Ed.2d 968 (1965), remanded for consent settlement, 382 U.S. 454, 86 S.Ct. 643, 15 L.Ed.2d 523 (1966).

5. Private Line Case, supra note 4, 34 F.C.C. at 250.

6. Id. at 305–07.

7. Id.

8. That rate was per channel per mile per month for the first 250 miles at 60 words

In 1956, the Commission launched an extensive investigation—known as the Private Line Case [9]—into private line services generally.[10] An initial decision in 1961 [11] and a final decision in 1963 [12] effected drastic changes in the structure and level of rates therefor. The Commission found that the then existing rates for private line telephone and telegraph—including teletypewriter—service did not provide an adequate margin of return, and that the differentials between full- and part-time use and between off-peak and peak-hour use were not justified by the costs of supplying the service.[13] To eliminate those ills, the Commission devised several cures. Higher earnings level for intercity teletypewriter channels were specified.[14] Lower charges for part-time and off-peak channels were scrapped.[15] A single flat rate—$1.10 per mile per month—for full-period channels was set.[16]

The Commission's action drew a strong protest from press users. After the initial decision, two groups [17] petitioned for reconsideration, alleging that the greater cost of private line teletypewriter service which the new pattern occasioned would impair the distribution of news information.[18] Both petitioners requested retention of the old rates, in lieu of the new, for press users.[19] On reconsideration, the Commission resolved to embark upon a separate investigation to ascertain whether the new rate would inhibit the dissemination of news.[20] The Commission inaugurated the new flat rate for non-press users but continued in force, pending completion of the investigation, the existing variable rates for private line teletypewriter service furnished press users.[21]

So it was that in May, 1963, the press rate investigation got under way [22] and on August 1, 1963, AT&T's new tariffs went into effect. Conformably with the Commission's decision, the new rate scheme excluded press service. In Tariff No. 134, the term "press," as a separate classification, was defined, and in Tariff No. 208 two sets of rates for intercity private line teletypewriter channels were established. One, for "Other Than Press," was the new flat full-period rate; the other, for "Press," was the preexisting group of variable rates. Later, these and other tariffs were consolidated into and superseded by Tariff No. 260, effective April 17, 1966. The parties are agreed that neither the new omnibus tariff nor any revision of it or its predecessors made any substantive change relevant to this case.[23]

per minute. Rates for greater distances and different speeds varied correspondingly. A supplemental service affording extra channels between two points already served was available at lower cost for minimal use. *Id.* at 306.

9. *Supra* note 4.

10. Broadcast program transmission was excepted. *Id.* at 247.

11. *Supra* note 2.

12. *Supra* note 2.

13. The Commission found that the channel had to be maintained regardless of time and length of use, and that sharing with other users was technologically unfeasible. The Commission's approach was upheld on appeal. Wilson & Co. v. United States, *supra* note 4, 335 F.2d at 800.

14. Private Line Case, *supra* note 4, 34 F.C.C. at 1098–1099.

15. *Id.* at 307–308.

16. *Id.* at 235. See also note 8, *supra*.

17. The American Newspaper Publishers Association and United Press International.

18. See Private Line Case, *supra* note 4, 34 F.C.C. at 1098–1099.

19. *Id.* at 1098.

20. *Id.*

21. *Id.* at 1098–1099.

22. The Commission determined ultimately that neither the then new non-press rates nor an intervening increase therein would have a significant impact on the widespread dissemination of news. In re American Tel. & Tel. Co., 24 F.C.C.2d 565 (1970), aff'd on review *sub nom.* Copley Press v. FCC, 144 U.S.App.D.C. 109, 444 F.2d 984 (1971).

23. Like the parties, then, we resort to relevant provisions in Tariffs Nos. 134 and 208 as well as to their counterparts in Tariff No. 260.

## II

The series of events generating this litigation began in October, 1964, when AP applied to AT&T for a lease of 175 intercity private line teletypewriter channels for the carriage of news information. AP sought press rates for 160 of the channels destined for part-time use, and other-than-press rates for the remaining 15, for which full-period use was contemplated. AT&T informed AP that in light of its representation that all channels would transmit news, the press rate was a tariff requirement.

AP responded with an informal complaint[24] to the Commission asserting a privilege to choose other-than-press rates for press channels when cheaper, and urging that AT&T had misinterpreted the tariffs in reaching the opposite conclusion. By a letter ruling, the Commission sustained AT&T's construction of the tariffs. AP then filed a petition for reconsideration[25] maintaining its earlier position, and later a formal complaint[26] against AT&T in which its thesis was somewhat broadened. The refusal to allow other-than-press rates for channels devoted to full-time press use, it said, was a misinterpretation of the tariffs; alternatively, it argued that application of press rates for full-time channel use, though for news transmis-

sion, was unreasonable and unduly discriminatory to the extent that press rates exceeded other-than-press rates.[27] AP requested reparations, based on the excess, for alleged overcharges on seven circuits,[28] and related declaratory and injunctive relief.[29]

AT&T filed an answer contesting AP's claims[30] and a motion for judgment. The parties agreeing that no resolution of disputed facts was prerequisite, the Commission ruled without an evidentiary hearing. It deemed AP's interpretation of the tariffs to be in contravention of their language;[31] the tariffs, it said, established separate rate classifications for press and non-press uses,[32] and conferred upon the customer no option to choose between classifications and none to the carrier to allow other-than-press rates for channels devoted to press purposes.[33] While recognizing that in a few instances costs of parts of the service were higher under the press rates than under the non-press rates,[34] the Commission rejected the discrimination charge on the ground that the continuation of the pre-1963 rates for press users benefited them by a preponderance of significantly lower charges for press service than those paid by others.[35] Then, treating AT&T's motion as one for dismissal, the Commission granted it and terminated the proceeding.[36]

---

24. Pursuant to 47 C.F.R. §§ 1.711–17 (1969).

25. Pursuant to Communications Act of 1934 § 405, as amended, 47 U.S.C. § 405 (1964), and 47 C.F.R. § 1.106 (1969).

26. Pursuant to Communications Act of 1934 § 208, 47 U.S.C. § 208 (1964).

27. See Communications Act of 1934 §§ 201(b), 202(a), as amended, 47 U.S.C. §§ 201(b), 202(a) (1964), quoted in relevant part *infra* notes 74, 76.

28. See Communications Act of 1934 § 207, 47 U.S.C. § 207 (1964). The period relevant to the demand for reparations is October 1, 1964, to August 1, 1967, the effective date of an increase in other-than-press rates which eliminated any advantage in their use.

29. The August 1, 1967, increase in non-press rates mooted the prayers for de-

claratory and injunctive relief though, of course, not the demand for reparations.

30. The answer also asserted a statute of limitations defense. See Communications Act of 1934 §§ 405, 415(c), 47 U.S.C. §§ 405, 415(c) (1964); 47 C.F.R. §§ 1.108(n), 1.718 (1969). Our disposition renders unnecessary any consideration of the issue in that regard.

31. Associated Press v. American Tel. & Tel. Co., *supra* note 2, 16 F.C.C.2d at 279.

32. *Id.*

33. *Id.*

34. *Id.* at 280.

35. *Id.*

36. *Id.* at 281.

### III

AP's initial contention is that AT&T's tariffs bar it from charging press customers more than other classes of subscribers to identical private line teletypewriter service. In an effort to buttress this position, AP directs attention to the language of the tariffs and to accepted canons of construction, and as well to what it views as long standing legislative and administrative policy in the communications field. AP then invokes the general principle that where service is made available under each of two tariff classifications, the customer is free to select the one most beneficial to him,[37] and insists that press users are entitled to the cheaper full-time non-press rates. In sum, the thrust of AP's argument is that it had the option of choosing between the full-period press and other-than-press rates regardless of the use to which the service circuits was to be put.

The Commission disagreed with AP's interpretation of the tariffs, and in the process rejected its principal arguments. Looking first to the tariffs themselves, the Commission said:

> We believe AP's construction of the tariffs is clearly contrary to the language contained in the applicable tariffs. As we view these tariffs, they establish two rate classifications, one applicable to press and one applicable to other than press. There is no language in these provisions which indicates that any user has the option to select one or the other classification. On the contrary we believe the lan-

guage is clear that if a press user, as defined in the tariff, uses the services or channels to transmit general news, as also defined in the tariff, the carrier must apply press rates to such services and channels. On the other hand rates shown therein for other than press apply to all other services and channels.[38]

Referring next to AP's reference to governmental policy the Commission reiterated its conclusion in the Private Line Case [39] that there had been no "affirmative policy of the United States Government that would require lower private line rates for the press than for other users. Certainly this Commission has not stated such policy."[40] Lastly, the Commission, while concurring in the proposition that an ambiguous tariff is to be construed against the carrier,[41] was "not persuaded by AP's 'canons of construction' argument,"[42] stating:

> [A] condition precedent to the application of this "canon" is a determination that the particular tariff provision is ambiguous. We cannot make such a determination with respect to the tariff provisions in issue here. As previously stated we believe it is clear that the tariffs establish two distinct rate classifications, one applicable to the press and one applicable to all other users. There is no language in the tariffs which permits the user to select a particular classification.[43]

We sustain the Commission's interpretation. That we may do without belaboring the standard by which the scope of judicial review of administrative tariff constructions is determined.[44] AP as-

---

37. See text *infra* at notes 65–66.

38. Associated Press v. American Tel. & Tel. Co., *supra* note 2, 16 F.C.C.2d at 279.

39. *Supra* note 4, 34 F.C.C. at 369.

40. Associated Press v. American Tel. & Tel. Co., *supra* note 2, 16 F.C.C.2d at 279.

41. *Id.*

42. *Id.*

43. *Id.* at 280.

44. See, *e. g.*, United States v. Western Pac. R.R., 352 U.S. 59, 64–66, 69, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956); United States v. Chesapeake & O. Ry., 352 U.S. 77, 80–81, 77 S.Ct. 172, 1 L.Ed.2d 140 (1956); W. P. Brown & Sons Lumber Co. v. Louisville & N. R.R., 299 U.S. 393, 397–399, 57 S.Ct. 265, 81 L.Ed. 301 (1937); Standard Oil Co. v. United States, 283 U.S. 235, 238–240, 51 S.Ct. 429, 75 L.Ed. 999 (1931); Great N. Ry. Co. v. Merchants' Elevator Co., 259 U.S. 285, 42 S.Ct. 477, 66 L.Ed. 943 (1922);

serts that the true meaning of the tariffs is a question of law and that the Commission's resolution has no particular force in this court; the opposing arguments suggest that at least some deference is due the Commission. We deem it unnecessary to enter the debate. The reasoning articulated by the Commission, so far as it goes, parallels our own, and alone would command our respect of its interpretation as one both rational and reasonable. And to the extent that we look beyond the considerations expressed by the Commission, the soundness of its interpretation is all the more convincingly demonstrated. So whether, in the case at bar, we give deference to the Commission's conclusion or construe the tariff provisions independently, we are led to the same result.

AP's takeoff point is a reference to a general provision appearing in the section captioned "Press" in Tariff No. 260, the superseding omnibus tariff. Following a statement that the rates and regulations specified therein "are those which were established for press in compliance with the" *Private Line Case*,[45] the provision continues:

These rates apply only to those private line services utilized by the press on which more than 50% of the information transmitted during a billing period will be general news for publication through the press. The customer shall represent to the Telephone Company, based on circumstances of use, whether or not press rates apply.[46]

AP places heavy reliance on the absence of an express ban on press use of the rates available to other commercial subscribers. AP attaches significance to the fact that the relevant passage is "[t]hese rates apply only to those private line services utilized by the press * * *," and is not one stating in so many words that only those rates shall apply to the press. From that AP infers that the ensuing specification of press rates does not preclude the press from utilizing other-than-press rates when they offer some advantage.

■■ Like the Commission, we are not constrained to give the quoted language so narrow a reading. It is derived from a section of the older Tariff No. 134 which was captioned "Services and Channels Furnished to the Press." Its companion, Tariff No. 208, specified two sets of rates, under the separate headings "Press" and "Other Than Press," and the definition of "press" in Tariff No. 134 plainly embraced the teletypewriter channels involved here. While the mere labeling of tariff provisions by no means settles the areas of their operation, labels do serve ostensibly the twin functions of denoting the rates applicable to a particular type of usage and distinguishing that type from others.[47] Also of relevance is the accepted principle that provisions under a specific tariff designation prevail over those included under a more general heading.[48]

■ Such were the provisions of Tariffs Nos. 134 and 208, which followed on the heels of the *Private Line Case* [49]

United States v. ICC, 114 U.S.App.D.C. 298, 300–301, 315 F.2d 44, 46–47 (1963). See generally 4 K. Davis, Administrative Law § 30.01 et seq. (1958).

45. *Supra* note 4.

46. Substantially the same provision was incorporated into Tariff No. 134. See note 23, *supra*, and accompanying text.

47. See United States v. Strickland Transp. Co., 200 F.2d 234, 235 (5th Cir. 1952); United States v. Missouri-K.-T. R.R., 194 F.2d 777, 779 (5th Cir. 1952). An analogy is the reference to a title in statutory construction. See FTC v. Mandel Bros., Inc., 359 U.S. 385, 388–389, 79

S.Ct. 818, 3 L.Ed.2d 893 (1959); Maguire v. Commissioner of Internal Revenue, 313 U.S. 1, 9, 61 S.Ct. 789, 85 L.Ed. 1149 (1941); First Bank & Trust Co. of Princeton v. Feuquay, 405 F.2d 990, 993 (6th Cir. 1969).

48. United States v. Gulf Ref. Co., 268 U.S. 542, 546, 45 S.Ct. 597, 69 L.Ed. 1082 (1925); Willingham v. Seligman, 179 F. 2d 257, 258 (5th Cir. 1950); West Coast Prods. Corp. v. Southern Pac. Co., 226 F.2d 830, 832–833 (9th Cir. 1955); Trans Ocean Van Serv. v. United States, 426 F.2d 329, 353, 192 Ct.Cl. 75 (1970).

49. *Supra* note 4.

and remained in force during most of the period for which reparations are sought.[50] As the parties concede, the later incorporation of those tariffs into Tariff No. 260 did not make for a change in substance.[51] Tariff No. 260 lists separately the flat rates, which were applicable to non-press users under Tariff No. 208, and the variable rates, which Tariff No. 260 specifically states "were established for press in compliance" with the decision in the *Private Line Case* [52] on reconsideration. And like Tariff No. 134, Tariff No. 260 expressly provides that "[t]he customer shall represent to the Telephone Company, based on circumstances of use, whether or not press rates apply." [53] That requirement would be superfluous if, regardless of circumstances of use, press rates were applicable only at the customer's option. The obvious indication, rather, is that instead it was the carrier who was to have the final word as to just which group of rates should apply. Reading the provisions of Tariffs Nos. 134 and 208 together and those of Tariff No. 260 as an integrated whole,[54] we think the confinement of press users to the press rates appears clearly enough.

That, in our view, becomes all the plainer when the language and structure of the tariffs are viewed against the backdrop of their evolution. As we noted earlier,[55] the variable rates determining the charges assessed for intercity private line teletypewriter service prior to the *Private Line Case* [56] were the same for press and non-press subscribers, and the new rates emerging from the Com-

mission's initial decision in that case likewise adhered to a standard of uniformity. Because two press associations protested that the new rates would constrict the dissemination of news, the Commission reconsidered and directed the specification, for the time being, of two sets of rates, to be applied to customers on the basis of their status as press or non-press users. Under the particular scheme sanctioned by the Commission, the rates already in existence were continued for press customers, while subscribers for other than press purposes were charged the newly formulated rates. This dual system of rates was an interim arrangement pending an investigation by the Commission to ascertain whether the generally costlier rates would derogate the transmission of news if applied to the press. This decision necessitated a cleavage in AT&T's rates according to whether press or non-press needs would be served.

So, the end and aim of the separate, special rate plan approved and mandated by the Commission was the maintenance of the status quo for the press pending an investigation of the feasibility, in terms of the news-distributing process, of increased rates. In no way did the Commission's action intimate an intention to reduce any rate for the press to a level below that which it had at the time of the Commission's decision. Nor did its action evince a purpose to enhance the economic position of the press by conferring upon it an option to dredge the non-press classification for rates more beneficial than it enjoyed before.[57]

50. See note 28, *supra*, and text *supra* at notes 22–23.

51. See note 23, *supra*, and accompanying text.

52. *Supra* note 4.

53. See note 46, *supra*, and accompanying text.

54. See Southern R. R. v. United States, 156 F.Supp. 740, 742, 140 Ct.Cl. 413 (1957); Great Northern R. R. v. Commodity Credit Corp., 164 F.Supp. 442, 445 (D.Minn.1958).

55. See the discussion in Part I, *supra*.

56. *Supra* note 4.

57. The Commission's clear purpose was to temporarily safeguard the press against the increased cost of the new rates in the aggregate, and not to guarantee that the press paid either more or less than non-press users for any particular phase of service. Private Line Case, *supra* note 4, 34 F.C.C. at 1098–1099. That purpose was achieved, not by exempting the press only from higher non-press rates, but by making all of the non-press rates inapplicable to the press. *Id.* at 1099.

A contrary interpretation would lead to the incongruous result that the Commission, while about to explore the possibilities of higher rates without impacting news dissemination, concomitantly provided some lower-than-before rates for the press to avoid just such an impact.

In our view, the tariff provisions in question can reasonably be read only as creating two distinct classes of private line teletypewriter users to which different rate schemes applied. That construction seems compelled by the structure and language of the tariffs, and it harmonizes perfectly with their historical antecedents and purposes. Such was the Commission's interpretation, and we are satisfied that it must prevail.

The validity of that conclusion we think, is unaffected by AP's argument that adherence to congressional and Commission policies dictates a construction in favor of lower rates for the press than for other communications subscribers. True it is that Congress has sometimes granted the press special privileges and immunities; [58] true it also is that the Commission has very properly responded to a sensitivity to a possible impact of rates on the dissemination of news. [59] To be sure, "[a] regulatory agency may, should, and in some instances must, give consideration to objectives expressed by Congress in other legislation, assuming they can be related to the objectives of the statute administered by the agency." [60] But here the Commission could discern no affirmative governmental policy sustaining the interpretation for which AP contends, and it disclaimed any such policy of its own making. [61] Our careful study of the matter has brought to light nothing that would refute the Commission. On the contrary, Congress has flatly condemned all undue preferences in rates, [62] the Commission has found that lower-than-usual rates for the press are unjustified, [63] and this court has sustained the Commission. [64] That, we believe, is the fountainhead of the governmental policy that is relevant in this case.

■ Nor do we find substance in AP's argument that a construction of Tariff No. 260 confining press users to press rates for teletypewriter service would exclude the press from access to other types of service made available to non-press customers. As AP points out, the non-press section fixes rates for services not mentioned in the separate section in which the press rates are found. We see nothing, however, in the Commission's decision treating the two sections as mutually exclusive as to services made available under the former but not the latter. As we view those provisions, the press is not excluded from any service; the two sections merely determine which of two rates is applicable to particular services specified in both.

58. See, *e. g.*, 7 U.S.C. § 609(g) (1964) (newsprint exempt from Agricultural Processing Tax) ; 19 U.S.C. § 1202 ¶¶ 252.65, 270.55, 724.15 (1964) (newsprint, newspapers and news recordings exempt from customs duty) ; 26 U.S.C. § 173 (1964) (newspapers entitled to capitalize circulation expenses) ; 26 U.S.C. § 4253 (b) (Supp. III 1968) (press exempt from excise tax on telephone and telegraph service) ; 39 U.S.C. § 4351 (1964) (press given preferential mail rates). See also Lewis Pub. Co. v. Morgan, 229 U.S. 288, 304, 33 S.Ct. 867, 57 L.Ed. 1190 (1913).

59. See Private Line Case, *supra* note 4, 34 F.C.C. 233, 1098–1099.

60. City of Chicago v. FPC, 128 U.S.App. D.C. 107, 113, 385 F.2d 629, 635, cert. denied, Public Service Commission of Wis. v. Federal Power Commission 390 U.S. 945, 88 S.Ct. 1028, 19 L.Ed.2d 1133 (1967) (citations omitted). See also Williams v. Washington Metropolitan Area Transit Comm'n, 134 U.S.App. D.C. 342, 380, 415 F.2d 922, 960 (en banc 1968), cert. denied, 393 U.S. 1081, 89 S.Ct. 860, 21 L.Ed.2d 773 (1969), and cases cited in note 219 thereof.

61. Associated Press v. American Tel. & Tel. Co., *supra* note 2, 16 F.C.C.2d at 279.

62. Communications Act of 1934 § 202(a), as amended, 47 U.S.C. § 202(a) (1964), quoted *infra* note 76.

63. In re American Tel. & Tel. Co., *supra* note 22.

64. Copley Press v. FCC, *supra* note 22.

A fair reading satisfies us that the press is at liberty to obtain other services at other-than-press rates.

To be sure, as AP contends, "[i]t is well settled that tariff provisions are to be construed strictly against the carrier, and any doubt resolved in favor of the" customer.[65] And for that reason, "where two descriptions and tariffs are equally appropriate, the [customer] is entitled to have applied the one specifying the lower rates." [66] We see no room, however, for invocation of these principles in this case. They are avenues of last resort, open only when the usual canons and techniques of interpretation leave real uncertainty as to the tariff standard.[67] "[C]laimed ambiguities or doubts as to the meaning of a tariff must have a substantial basis in the light of the ordinary meaning of the words used and not a mere arguable basis," [68] and complexity of the constructional problem cannot be equated with ambiguity.[69] The Commission found no such uncertainty,[70] nor do we. It is as evident to us as it was to the Commission that the language and structure of the tariffs, particularly in the setting of their history and purpose well known to all concerned,[71] make press users of private line teletypewriter service eligible for press rates alone.

## IV

Thus we reach AP's contention that the tariffs, so construed, are unjust, unreasonable and unduly discriminatory. AP is mindful of the Commission's express statutory power to separately classify press and other rates, and to authorize different charges for each.[72] It argues, however, that the billing of press users at the higher full-period press rate for the same full-time service afforded other commercial users at the other-than-press rate is unlawful. The Commission refused to convene a formal hearing solely on the basis of that allegation,[73] and we think the Commission's ruling was clearly right.

The relevant ratemaking powers and responsibilities of the Commission are broadly specified by statute. Charges and classifications in connection with wire and radio communications must be just and reasonable, and those which are not are unlawful.[74] Communications

---

65. United States v. ICC, 91 U.S.App.D.C. 178, 186 n. 5, 198 F.2d 958, 966 n. 5 (1952).

66. United States v. Gulf Ref. Co., *supra* note 48, 268 U.S. at 546, 45 S.Ct. at 599.

67. National Dairy Prods. Corp. Kraft Foods Division v. Missouri-K.-T. R.R., 385 F.2d 173, 177 (5th Cir. 1967) ; Bolin Drive-A-Way Co. v. United States, 283, F.2d 697, 698, 151 Ct.Cl. 164 (1960). See generally 3 Corbin, Contracts § 559 at 268–270 (1960).

68. United States v. Missouri-K.-T. R.R., *supra* note 47, 194 F.2d at 778–779. See also Raymond City Coal & Transp. Corp. v. New York Cent. R.R., 103 F.2d 56, 57 (6th Cir. 1939) ; Christensen v. Northern Pac. Ry., 184 F.2d 534, 536 (8th Cir. 1950) ; Associated Wholesale Grocers, Inc. v. United States, 272 F.Supp. 274, 277 (D.Kan.1967) ; Fort Worth & Denver City Ry. v. Childress Cotton Oil Co., 48 F.Supp. 937, 939 (N.D.Tex.1942), aff'd, 141 F.2d 558 (5th Cir. 1944).

69. National Dairy Prods. Corp. Kraft Foods Division v. Missouri-K.-T. R.R., *supra* note 67, 385 F.2d at 176–177.

70. Associated Press v. American Tel. & Tel. Co., *supra* note 2, 16 F.C.C.2d at 279–280.

71. "The construction [of tariffs] should be that meaning which the words used might reasonably carry to the [customer] to whom they are addressed." United States v. ICC, *supra* note 65, 91 U.S.App.D.C. at 186, 198 F.2d at 966, quoting Union Wire Rope Corp. v. Atchison, T. & S. F. Ry., 66 F.2d 965, 966–967 (8th Cir.), cert. denied, 290 U.S. 686, 54 S.Ct. 122, 78 L.Ed. 591 (1933).

72. See notes 74, 76, *infra*.

73. Associated Press v. American Tel. & Tel. Co., *supra* note 2, 16 F.C.C.2d at 280–281.

74. "All charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful: *Provided,* That communications by wire or radio subject to this chapter may be classified into day, night, repeated, unrepeated, letter, com-

may, however, be categorized into "press * * * and such other classes as the Commission may decide to be just and reasonable, and different charges may be made for the different classes of communication." [75] These provisions are complemented by general prohibitions imposed upon carriers. Those pertinent here forbid "any unjust or unreasonable discrimination in charges [or] * * * classifications * * * for or in connection with like communication service," [76] and "any undue or unreasonable preference or advantage," or "any undue or unreasonable prejudice or disadvantage" to "any particular person" or "class of persons." [77]

Nothing in the Commission's disposition of this proceeding suggests unfaithfulness to these statutory mandates. As the Commission recognized, the charge of unlawfulness rested entirely upon a comparison of press and non-press rates for full-period service—$1.45 and $1.10, respectively. As the Commission stated, AP's specific claim was "that the press rate is excessive by the difference between such press rate and the rate applicable to all other users." [78] The Commission pointed out that AP "did not submit any data or information in support of this allegation" [79] and, in the view "that the mere allegation of unlaw-

fulness is not a sufficient reason to enter upon a formal hearing," dismissed AP's complaint. [80]

The Commission found support for this disposition in the historical antecedents of the press classification under attack. [81] As the Commission recounted, press representatives sought reconsideration of the *Private Line Case* on the ground that rates it prescribed would adversely affect the widespread dissemination of news, and requested the establishment of a separate press classification as authorized by statute. [82] In response, the Commission recalled, it stayed the application of the new rates to press users, and thus in effect created for them a special rate classification pending an investigation to determine the impact, if any, of the new rate structure on news transmission. [83] That classification, as we have said, must stand unless it is unjust or unreasonable, or otherwise in contravention of the general prohibitions against discrimination and preferences. [84] We hold with the Commission that AP's allegations did not present an occasion for a formal hearing.

■ Not every variation in prices charged customers for a particular feature of the carrier's service supports a claim of unlawful discrimination. [85]

---

mercial, press, Government, and such other classes as the Commission may decide to be just and reasonable, and different charges may be made for the different classes of communications * *." Communications Act of 1934 § 201(b), as amended, 47 U.S.C. § 201(b) (1964).

75. See note 74, *supra*.

76. "It shall be unlawful for any common carrier to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service, directly or indirectly, by any means or device, or to make or give any undue or unreasonable preference or advantage to any particular person, class of persons, or locality, or to subject any particular person, class of persons, or locality to any undue or unreasonable prejudice or disadvantage." Communications Act of 1934 § 202(a), as amended, 47 U.S.C. § 202(a) (1964).

77. See note 76, *supra*.

78. Associated Press v. American Tel. & Tel. Co., *supra* note 2, 16 F.C.C.2d at 280.

79. *Id.*

80. *Id.*

81. *Id.* See also Part I, *supra*.

82. *Id.*

83. *Id.*

84. Text *supra* at notes 74–77.

85. See, *e. g.*, General Tel. Co. of the Southwest v. Robinson, 132 F.Supp. 39, 44 (E.D.Ark.1955). In the statutory language, only "unjust or unreasonable" discriminations and undue or unreasonable" preferences and prejudices have that effect. Compare United States v. Illinois Cent. R.R., 263 U.S. 515, 521, 44 S.Ct. 189, 68 L.Ed. 417 (1924); Manufacturers Ry. v. United States, 246 U.S.

Since rate classifications, no less than other classifications, may be justified by differences between the classes, the mere existence of a disparity between particular rates does not establish a statutory violation.[86] Much less can an allegation of discrimination safely be predicated upon a piecemeal comparison of classified tariff charges.[87] AP, we repeat, singled out the mismatch of full-period rates for press and non-press subscribers without any consideration of the overall equivalence of the rates fixed for the two classes. The rates, moreover, were structured differently for the two classes,[88] a factor compounding the unreliability of any contrast in selected parts.[89] We join in the Commission's implicit conclusion that a difference in press and non-press rates merely for one phase of the service tended to show little or nothing in support of AP's claim.

The relevant comparison here, we think, was between press and non-press rates as two entireties. On that score, the Commission observed that "[w]ith the new tariff and the accompanying rearrangement of rates, a few situations did exist where costs of parts of the service were higher under the press rates than under the new other than press rates."[90] But, the Commission hastened to add, "the preservation of the former rates to the press has greatly inured to their benefit as they are receiving a preponderance of significantly lower charges for press services than those charges paid by those in the other than press classification."[91] That consideration, the verity of which has not been challenged before us, is decisive in this litigation.

The Commission, as we have said, is statutorily empowered to classify the press separately from other customer groups, and to establish different charges for press and nonpress communications, subject to the requirement that the rates thus prescribed be just and reasonable, and the further requirement that undue or unreasonable discriminations and preferences be avoided.[92] Standing alone, neither the fact of separate classification nor the fact of a difference in tariff charges exerts any real tendency to demonstrate a collision with the statutory prohibitions.[93] That is all the more so where, despite some difference in rates for particular aspects of the service, the protestant enjoys the advantage of a cheaper rate for the service as a whole.

That AP did just that was the Commission's view, and from aught that appears that view was correct. If it was not, it was at the very least

457, 481, 38 S.Ct. 383, 62 L.Ed. 831 (1918).

86. See Chicago, M., St. P. & Pac. R. R. v. Illinois, 355 U.S. 300, 306–308, 78 S.Ct. 304, 2 L.Ed.2d 292 (1958); North Carolina v. United States, 325 U.S. 507, 516, 65 S.Ct. 1260, 89 L.Ed. 1760 (1945); Florida v. United States, 282 U.S. 194, 211, 51 S.Ct. 119, 75 L.Ed. 291 (1931). AP relies upon American Trucking Ass'ns v. FCC, 126 U.S.App.D.C. 236, 377 F.2d 121 (1966), cert. denied, 386 U.S. 943, 87 S.Ct. 973, 17 L.Ed.2d 874 (1967), but that case is inapposite. There we addressed carrier discrimination within a single class, and did not consider the problem posed here of differing rates between customers in different classes.

87. See Wilson & Co. v. United States, supra note 4, 335 F.2d at 800–801.

88. As we observed, the interim press rates established one price for channels used full-time and lesser prices for lesser service. For non-press use, the Commission substituted a flat charge for channels regardless of amount of use. See Private Line Case, supra note 4, 34 F.C.C. at 307.

89. That is because the press rate for full-period channels quite obviously operated in practice as a partial offset to a preponderance of lower charges for part-time channels available to press but not to non-press users.

90. Associated Press v. American Tel. & Tel. Co., supra note 2, 16 F.C.C.2d at 280.

91. Id.

92. See text supra at notes 74–77.

93. See Wilson & Co. v. United States, supra note 4, 335 F.2d at 800–801.

**1302**

incumbent upon AP to say so.[94] Only recently we reemphasized that "[i]n order to serve the basic interest of the public the Commission is entitled to insist upon more than conclusional allegations easily made and which, if accepted, entail unjustified delay and consumption of the Commission's time and energy."[95] We think the Commission remained on firm ground in holding "that there are no reasonable grounds for investigating AP's complaint."[96]

Affirmed.

---

94. Compare Green v. FCC, 144 U.S.App. D.C. 353 at 359, 447 F.2d 323 at 329 (1971).

95. Copley Press v. FCC, *supra* note 22, at 11, quoting Folkways Broadcasting Co. v. FCC, 126 U.S.App.D.C. 123, 127, 375 F.2d 299, 303 (1967).

96. Associated Press v. American Tel. & Tel. Co., *supra* note 2, 16 F.C.C.2d at 281. In this view, we do not reach the question whether reparations could in any event be properly awarded to AP consistently with Arizona Grocery Co. v. Atchison, T. & S. F. R.R., 284 U.S. 370, 52 S.Ct. 183, 76 L.Ed. 348 (1932).